**NATIONAL HYDRO SYSTEMS, a division of McNISH CORPORATION, Respondent,**

v.

**M.A. MORTENSON COMPANY, et al., Defendants,**

**HDR Engineering, Inc., petitioner, Appellant.**

No. C1–93–752.

Supreme Court of Minnesota.

April 14, 1995.

8(d)(2), Rules on Lawyers Professional Responsibility (RLPR).

Rebecca Egge Moos, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for appellant.

Thomsen & Nybeck, P.A., Mark G. Ohnstad, Edina, for respondent.

Heard, considered, and decided by the court en banc.

## OPINION

KEITH, Chief Justice.

Appellant, HDR Engineering, Inc. ("HDR"), seeks review of a court of appeals' decision reversing the trial court's summary judgment of a claim brought by Respondent, National Hydro Systems ("National Hydro"). The principal issue raised on this appeal is whether the general contractor, M.A. Mor-

tenson Company ("Mortenson"), is obligated under the general construction contract to indemnify HDR for a claim arising out of HDR's own negligence, thereby creating a circuity of obligation that defeats National Hydro's claim as a matter of law. Because we conclude that HDR is not entitled to indemnity for a claim arising out of its own negligence, a circuity is not created in the present case. We therefore affirm the court of appeals.

In 1988, the Metropolitan Waste Control Commission ("MWCC") undertook to expand and upgrade the Seneca Wastewater Treatment Plant (the "Project"). The MWCC entered into an engineering contract with HDR in January of 1988 under which HDR was to draft plans and specifications and to approve shop drawings for the Project. Subsequently, on July 12, 1989, the MWCC awarded Mortenson the general contract which contained an indemnity provision under Article 15:

> 15.1 *OBLIGATION OF CONTRACTOR:* The CONTRACTOR shall indemnify and hold harmless and defend the COMMISSION and the ENGINEER and their agents, consultants, and employees from and against all claims, legal actions, arbitration demands, extra costs, and losses and expenses of any nature or form whatsoever whether founded in breach of contract, negligence, or pursuant to Contract provisions or howsoever premised, including the payment of all attorney fees and costs related thereto howsoever and whensoever incurred in such matters which arise out of or result from performance of the WORK by CONTRACTOR and its employees, its Subcontractors, suppliers, material people, and other agents or consultants * * *.

In turn, Mortenson entered into an unwritten agreement with National Hydro to supply final clarifiers[1] for the Project. Pursuant to this agreement with Mortenson, National Hydro submitted shop drawings of the final clarifiers to HDR for review. HDR rejected these initial shop drawings. The parties dispute whether the drawings conformed to HDR's plans and specifications or whether they constituted a deviation. The parties ultimately used an alternative design, but a several-month delay in the delivery of the clarifiers resulted, and Mortenson withheld $371,370 from its payment to National Hydro.

National Hydro commenced suit against Mortenson for nonpayment alleging breach of contract and unjust enrichment, and against HDR for the costs of additional design work allegedly arising from HDR's professional negligence. Trial was scheduled to begin on January 11, 1993. On December 29, 1992, National Hydro settled its claim with Mortenson and entered into a *Pierringer* release[2] under which National Hydro agreed to defend, indemnify and hold Mortenson harmless if National Hydro succeeded in its claim against HDR and if HDR then sought indemnity from Mortenson. On January 8, 1993, HDR moved for summary judgment on the grounds that the *Pierringer* release, in combination with the Article 15 indemnity provision, created a circuity of obligation defeating National Hydro's claim against HDR as a matter of law.

On the day trial was to begin, the court orally granted summary judgment in favor of HDR. National Hydro moved to reconsider the matter, and the court heard additional arguments pursuant to the motion on January 26, 1993. In its amended findings and conclusions filed February 1, 1993, the court reaffirmed summary judgment and dismissed National Hydro's claim. The court found that Article 15 required Mortenson to indemnify HDR for National Hydro's negligence claim that arose in the context of the performance of work on the Project including Mortenson's and National Hydro's work.

The court of appeals reversed the trial court's summary judgment, holding that the indemnity provisions did not create a circuitous obligation and therefore National Hy-

---

**1.** Clarifiers are structures that clarify water by allowing heavier material to settle and clean water to rise to the top.

**2.** The *Pierringer* release is a settlement device named after the Wisconsin Supreme Court decision in *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (Wis.1963).

dro's claim was not defeated as a matter of law. *National Hydro Sys., a Div. of McNish Corp. v. M.A. Mortenson Co.*, 507 N.W.2d 27 (Minn.App.1993).

## I.

■ As a preliminary issue, we first recognize that a finding of circuity of obligation will defeat a plaintiff's claim as a matter of law. A circuity of obligation is created when, by virtue of pre-existing indemnity agreements or obligations, the plaintiff is in effect obligated to indemnify the defendant for claims including the plaintiff's own claim. *See Hoffmann v. Wiltscheck*, 411 N.W.2d 923, 926 (Minn.App.), *pet. for rev. denied* (Minn., Nov. 13, 1987); *Bogatzki v. Hoffman*, 430 N.W.2d 841 (Minn.App.), *pet. for rev. denied* (Minn., Dec. 21, 1988). In such a situation, the plaintiff's right to recover damages from the defendant is offset by the plaintiff's obligation to repay the same damages to the defendant. *Hoffmann*, 411 N.W.2d at 926. In the present case, circuity of obligation exists only if the Article 15 indemnity provision is enforceable as to National Hydro's claim.

■ As an additional preliminary matter, National Hydro urges this court to hold that public policy prohibits indemnity of an engineer for claims arising out of the engineer's own negligence. While public policy may favor the competent practice of engineers, statutory and case law appear to support rather than oppose as a matter of public policy the use of risk allocation agreements in the construction setting. We are, therefore, not prepared to hold at this time that agreements which indemnify an engineer for its own negligence are void as against public policy.

## II.

■ Turning to the primary issues, we must first determine whether National Hydro's claim against HDR "arise[s] out of or result[s] from performance of the WORK by CONTRACTOR and its employees, its Subcontractors, suppliers, material people, and other agents or consultants" as required by the Article 15 indemnity provision. Interpreting a similar provision, this court in *Anstine v. Lake Darling Ranch* held that such a clause requires a "temporal, geographical, or causal nexus between the [indemnitor's] work and the injury which gives rise to liability." 305 Minn. 243, 249, 233 N.W.2d 723, 727 (1975).[3]

■ HDR asserts that *Anstine*'s causal requirement should be interpreted as a "but-for" test and that National Hydro's claim falls within the Article 15 language because it would not exist, but for the work of supplying the clarifiers for the Project. It is not enough, however, that the causal connection exist between the injury and any work on the Project; rather, a "but-for" causal connection exists between the injury and the *indemnitor's* work. *See Anstine*, 305 Minn. at 249, 233 N.W.2d at 727; *Johnson v. McGough Constr. Co., Inc.*, 294 N.W.2d 286, 288 (Minn. 1980); *Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 121 (Minn.App.1988); *Fossum v. Kraus–Anderson Constr. Co.*, 372 N.W.2d 415, 418 (Minn.App.1985). National Hydro's claim against HDR is based on HDR's alleged negligence in drafting the original plans and specifications and in rejecting National Hydro's initial shop drawings. This claim is distinct from National Hydro's claim against Mortenson. Although Mortenson was required to review the shop drawings, the specific actions upon which National Hydro's claim is based were the responsibilities of HDR under the engineering contract and therefore constituted HDR's work, not Mortenson's work. Because National Hydro's claim against HDR arises out of HDR's conduct in regard to its own portion of the work and not Mortenson's portion of the work, we find that the Article 15 indemnity provision does not apply to National Hydro's claim.

## III.

Even if we assume, arguendo, that National Hydro's claim does arise out of the work

3. *Anstine* has been expressly overruled by *Farmington Plumbing & Heating Co. v. Fischer Sand and Aggregate, Inc.* to the extent that it rejected the strict construction rule for indemnity agreements. 281 N.W.2d 838, 840 n. 4 (Minn.1979).

by Mortenson, a second issue is whether Article 15 is enforceable as to claims alleging negligence of the indemnitee (HDR) itself.

■ This court has adopted the majority rule of strict construction: "Indemnity agreements are to be strictly construed when the indemnitee * * * seeks to be indemnified for its own negligence. There must be an express provision in the contract to indemnify the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication." *Farmington Plumbing*, 281 N.W.2d at 842 (citing *Webster v. Klug & Smith*, 81 Wis.2d 334, 260 N.W.2d 686, 690 (1978)). Agreements seeking to indemnify the indemnitee for losses occasioned by its own negligence are not favored by the law and are not construed in favor of indemnification "unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed to it." *Braegelmann v. Horizon Dev. Co.*, 371 N.W.2d 644, 646 (Minn.App.), *pet. for rev. denied* (Minn., Oct. 11, 1985). Moreover, additional limiting language may render an otherwise clear and unequivocal provision equivocal, thus precluding indemnity. *See Ford v. Chicago, Milw., St. P. and Pac. R.R.*, 294 N.W.2d 844, 846 (Minn.1980); *Braegelmann*, 371 N.W.2d at 646.

■ The key question, then, is whether the Article 15 provision is clear and unequivocal or whether it is not. This determination turns on the unique language of Article 15, which is not found in prior cases addressed by this court. It is evident, however, that we have been reluctant to impose indemnity unless we are able to identify some specific language expressing an intent to indemnify the indemnitee for claims arising out of its own negligence. *See, e.g., Johnson*, 294 N.W.2d at 287; *Oster*, 428 N.W.2d at 118–19; *Bogatzki*, 430 N.W.2d at 845.

In light of these cases, it is not immediately apparent that Article 15 clearly and unequivocally expresses an intent to indemnify HDR for claims based on HDR's own negligence. Although the first clause of Article 15 may indeed be broad enough to incorporate rate claims of negligence, the provision contains an additional clause limiting the breadth of the obligation: "which arise out of or result from performance of the WORK by CONTRACTOR * * *."[4] This additional clause puts the scope of indemnity in question, rendering the provision equivocal.

We reiterate today the continuing validity of the *Farmington Plumbing* requirement that the language of an indemnity provision will be strictly construed if it is to provide indemnity for claims based on the indemnitee's own negligence. We will continue to require the parties to such an indemnity agreement to express this intent in a clear and unequivocal manner. Because Article 15 is equivocal as to whether it applies to claims occasioned by the indemnitee's own negligence, HDR is not entitled to indemnity for its own negligence. National Hydro's claim, therefore, is not defeated as a matter of law.

### IV.

Having concluded that no circuity of obligation exists in the present case defeating National Hydro's case as a matter of law, it is not necessary to reach the issue of whether National Hydro was afforded sufficient notice of summary judgment.

Affirmed.

COYNE, Justice (dissenting).

I respectfully dissent. It is apparent to me that Article 15 of the construction contract between the Metropolitan Waste Control Commission and M.A. Mortenson Company was designed to require Mortenson to indemnify the Commission and its engineer, HDR, against just such a claim as that asserted here by National Hydro Systems. Moreover, recognition of its obligation to indemnify HDR for its attorney fees and related costs incurred in defense of the action undoubtedly was a factor in Mortenson's decision to settle National Hydro's claim against it and to enter into a *Pierringer* release which would simultaneously relieve

---

4. It is important to note that in using the language "performance of the WORK by CONTRACTOR," Article 15 departs from the standard American Institute of Architects or Associated General Contractors indemnity provision language.

Mortenson of its contractual obligation to HDR.

At the outset it is desirable to observe that Mortenson is not merely the general contractor for the Seneca project, Mortenson is the sole prime contractor for the project—that is, the Commission contracted with Mortenson for the entire construction project. Mortenson selected and entered into contracts with various subcontractors and material suppliers. It should also be noted that when the term "WORK" appears in the construction contract, it refers to the work of the contract—that is, the labor and materials Mortenson is required to provide pursuant to its contract with the Commission for the complete construction of the Seneca project.

The sections of the contract relevant to this discussion are these:

Article 15. INDEMNIFICATION

15.1 OBLIGATION OF CONTRACTOR: The CONTRACTOR shall indemnify and hold harmless and defend the COMMISSION and the ENGINEER * * * from and against all claims, legal actions, arbitration demands, extra costs, and losses and expenses of any nature or form whatsoever whether founded in breach of contract, negligence, or pursuant to Contract provisions or howsoever premised, including the payment of all attorney fees and costs related thereto howsoever and whensoever incurred in such matters which arise out of or result from performance of the WORK by CONTRACTOR and its employees, its Subcontractors, suppliers, material people, and other agents or consultants including, but not limited to, the following:

* * * * * *

15.1.4 Claims for labor or material furnished for the WORK including, but not limited to, claims and demands of Subcontractors, * * * material people, and furnishers of machinery and parts thereof * * * and all supplies utilized in performance of the WORK or otherwise.

In short, although rather unartfully drawn, Article 15, as a whole, requires Mortenson to indemnify and hold harmless and defend HDR against all *claims by the Contractor or any of its subcontractors* or material suppliers, regardless whether the claims sound in contract or tort. Claims like those of National Hydro for labor and material are expressly included in Mortenson's indemnity obligation. Of course, the claims must arise out of or result from performance of the work of the contract.

Surely, one would think, there could be no question that National Hydro's claims against both Mortenson and HDR arise out of the work of the contract. The contract required Mortenson to supply and install clarifiers. The contract also required Mortenson to provide shop drawings of the clarifiers:

4.7 SHOP DRAWINGS

4.7.1 SUBMISSIONS: * * * The CONTRACTOR shall provide Shop Drawings as may be necessary for the prosecution and progress of the WORK, and as required by the Contract Documents * * *. The ENGINEER's [sic] review of Shop Drawings shall not release the CONTRACTOR from responsibility for deviations from the Contract Documents contained therein unless such deviation from the requirement of the Contract Documents shall be authorized by a Change Order. * * *

4.7.2 When submitted for the ENGINEER's review, Shop Drawings shall bear the CONTRACTOR's [sic] certification that it has reviewed, checked, and approved the Shop Drawings and that they are in conformance with the requirements of the Contract Documents.

* * * * * *

4.7.4 The CONTRACTOR shall be responsible for the timely submission, revision, and resubmission of Shop Drawings to prevent delay of work. * * *

4.7.5 Shop Drawings shall include all manufactured items proposed to be furnished and all work to be performed on or off the site for which detailed drawings are needed to show conformance with the detailed requirements of the Drawings and Specifications. * * * * Conformance of Shop Drawings here-

with shall be the sole responsibility of the CONTRACTOR and the failure of Shop Drawings to so conform, even if earlier reviewed by the ENGINEER, shall be the sole risk of the CONTRACTOR and CONTRACTOR shall not be entitled to additional Contract Price or Contract Time for work or other action necessary to make said Shop Drawings conform to the Contract Documents and work required thereby even if approved by the ENGINEER.

4.7.6 DEVIATIONS: At the time of submittal of Shop Drawings, the CONTRACTOR shall note thereon, or in writing on attachments, any deviation from the Contract Documents indicated on the Shop Drawings and reason for the proposed change. * * * Failure of CONTRACTOR *to note said deviation and to request a Change Order shall waive all rights of the CONTRACTOR to additional Contract Price or Contract Time* * * *.

Mortenson elected, however, to purchase the clarifiers from and to subcontract the shop drawings for the clarifiers to National Hydro. National Hydro's shop drawings depicted a "T" design bridge on the clarifiers rather than the "star" design specified by the project plans and specifications, and HDR rejected them. Although National Hydro insists that *its shop drawings of the clarifiers did not deviate from the contract documents,* a "T" design bridge in lieu of the "star" design bridge specified by the contract documents can hardly be said to conform to the contract documents. Ultimately, shop drawings depicting an "H" design of the clarifier bridge were accepted, but delivery of the clarifiers was delayed. Presumably because of the late delivery, Mortenson refused to pay $371,370 of the amount it had orally agreed to pay National Hydro. National Hydro alleges that Mortenson has been paid the full contract amount by the Commission.

National Hydro then instituted this action to recover the unpaid balance of its contract price from Mortenson and to recover from HDR the additional costs incurred in preparing new shop drawings and expenses incurred by reason of the delay in delivery of the clarifiers. It comes as no surprise that National Hydro denies that the shop drawings originally submitted deviated in any respect from the Contract Documents and that it asserts that these expenses were caused by HDR's negligence. To argue, however, as does National Hydro, that its claims do not arise out of the work of Mortenson's contract because the work Mortenson itself performed was not the cause of both the revision of the shop drawings and National Hydro's inability to collect the $371,370 of its contract price is sheer nonsense. The work Mortenson was *obliged* by its contract to perform included the preparation of the shop drawings of the clarifiers—WORK which National Hydro undertook to perform on Mortenson's behalf—WORK for which National Hydro now claims it has not been properly compensated. Extracting part of a sentence from *Anstine v. Lake Darling Ranch,* 305 Minn. 243, 249, 233 N.W.2d 723, 727 (1975), National Hydro and the majority assert that an indemnity provision in a construction contract requires a "temporal, geographical, or causal nexus between the [indemnitor's] work and the injury which gives rise to liability," [1] and therefore, because National Hydro alleges that its claim against HDR is based on HDR's negligence in preparing the project plans and specifications and in rejecting National Hydro's shop drawings, its claim does not arise out of the work of the construction contract. But reliance on *Anstine* for that proposition is misplaced.

Let us first examine the context in which the quoted statement appears. Anstine, a plumber apprentice, sued the general contractor to recover for bodily injuries sustained when he fell from the roof of a building under construction. The general contractor joined all its subcontractors as third-party defendants, seeking indemnity pursuant to their subcontracts. *Id.* The district court granted summary judgment to eight subcontractors who were not working at the construction site at the time of Anstine's

---

**1.** The majority opinion substitutes the bracketed term "indemnitor's" for "subcontractor's." *See*

*Anstine,* 305 Minn. at 249, 233 N.W.2d at 727.

injury; four of these subcontractors had not even entered into subcontracts until long after Anstine's injury.

The general contractor appealed, contending that all the subcontractors for the project formed a pool for the indemnification of the general contractor. The general contractor based its argument on *Christy v. Menasha Corp.*, 297 Minn. 334, 211 N.W.2d 773 (1973), and *Jacobson v. Rauenhorst Corp.*, 301 Minn. 202, 221 N.W.2d 703 (1974). Acknowledging that in each of those cases the court had held that the prime contractor was entitled to indemnity from the subcontractor whose employee had been injured, even though the cause of injury in each case was the negligence of the prime contractor—the indemnitee—the court went on to point out that in each of those cases the injury arose out of the work performed by the non-negligent subcontractor from whom indemnity was sought. Whether other subcontractors whose work had no connection with the injury could be required to indemnify the negligent prime contractor simply was not in issue.

Returning to the issue before it in *Anstine*, the court stated that the accident that befell Anstine would have occurred even if none of the eight subcontractors who were dismissed from the lawsuit had ever been present on the project. Therefore, it was "wholly unreasonable to say that [Anstine's] injury arose out of or was connected with their work, for the work under their subcontracts was not a 'but for' cause of the injury." *Anstine*, 233 N.W.2d at 727–28. In the factual context of the court's statement, "temporal and geographical or a causal relationship" does not refer to the conduct causing the injury. The presence of the plumbing subcontractor and the injured plumbing apprentice did not "cause" the injury even though the injury would not have occurred "but for" the fact that at the time of injury the plumbing subcontractor was performing part of the work of the construction contract on the general contractor's behalf. That "but for" causal connection was not a "cause" at all in the legal sense; it was simply the "occasion" for the injury. The sufficiency of that connection to invoke the indemnity provision with

respect to bodily injury arising out of the work of the plumbing subcontract was never contested in *Anstine*. *Anstine* was concerned only with the converse of that issue: did Anstine's injury arise out of the work of subcontractors who were not present at the construction site when the injury occurred?

Even though the decision in *Anstine* does not directly address the question whether National Hydro's claim arises out of the work of Mortenson's construction contract, its rationale is instructive. Just as Anstine's injury arose out of his employer's work pursuant to its plumbing subcontract, so also does National Hydro's claim arise out of the work of the construction contract for the Seneca project—work National Hydro was performing on Mortenson's behalf pursuant to National Hydro's unwritten agreement with Mortenson. Had National Hydro not been required by its agreement with Mortenson to prepare the shop drawings Mortenson was required to provide pursuant to its contract as well as to supply the clarifiers called for in Mortenson's construction contract, National Hydro would not have had any claim against either Mortenson or HDR. Although National Hydro's claim may not have resulted from performance of the work of the construction contract by Mortenson or its other subcontractors, suppliers, or material people (assuming arguendo that section 15.1 refers to performance of the work of the contract by Mortenson or its subcontractors or suppliers of materials), the claim very clearly arises out of that work regardless what conduct or whose conduct caused National Hydro's alleged injury. *See* Art. 15, §§ 15.1, 15.1.4, Constr. Contract.

National Hydro's contention that its claim for compensation does not arise out of the work it performed pursuant to its subcontract with Mortenson is based solely on its *allegation* that HDR was negligent in the preparation of the plans and specifications for the Seneca project. Therefore, National Hydro argues, its claim arises not out of its work on the project but arises only out of HDR's negligence. The fallacy in that argument is that allegations of fault simply are immaterial to a determination whether the

claim arises out of the work required pursuant to the construction contract.

We have previously had occasion to consider the meaning of the term "arising out of" and have declared that defining phrases such as "flowed from," "grew out of" or "natural and reasonable consequence" delineate the appropriate connection and that no more specific definition is necessary or possible. *Rausch v. Beech Aircraft Corp.*, 277 N.W.2d 645, 647 (Minn.1979); *Associated Indep. Dealers, Inc. v. Mutual Serv. Ins. Cos.*, 304 Minn. 179, 182, 229 N.W.2d 516, 518 (1975); *see also Breimhorst v. Beckman*, 227 Minn. 409, 421, 35 N.W.2d 719, 728 (1949).

The majority asserts that in order for a claim to arise out of "the WORK by CONTRACTOR and its employees, its Subcontractors, suppliers, material people, and other agents or consultants," Article 15, "a 'but for' causal connection must exist between the injury and the *indemnitor's* work" (emphasis in majority opinion).[2] Of course, *all* of the WORK performed pursuant to the construction contract was performed by Mortenson, the sole CONTRACTOR or its subcontractors, suppliers, material people or other agents or consultants. Moreover, the requirement that the connection be with *Mortenson's* (the only indemnitor) work simply ignores the remainder of the contractual indemnity provision, which includes not only work by Mortenson but also the work performed by its subcontractors, of which National Hydro is surely one. There is most certainly a "but for" connection between National Hydro's alleged injury to its purse and its work on the Seneca project; "but for" its preparation of shop drawings it could not even allege a claim against HDR.

The point is illustrated by an uncomplicated and commonplace automobile accident. A stops her car at an intersection in obedience to the command of a semaphore. While A waits for the light to change to green, B negligently drives his car into A's car, injuring A and damaging A's car. A files a claim against her insurer for no-fault economic loss benefits and for the damage to her automobile. A also asserts a cause of action sounding in negligence against B, and there can be no doubt that that cause of action arises out of the use of both A's car and B's car. Nevertheless, if A's insurer argued that because A's claim against B is separate and different from her claim against her insurer her claim does not arise out of the use of her automobile, the insurer's argument would surely be considered frivolous. In short, a number of different claims of different types can "arise out of" a single source.

Having demonstrated that National Hydro's claim is within the purview of Article 15, let us turn to whether HDR is entitled to the indemnity contemplated by Article 15. As noted earlier, the construction contract imposed on Mortenson the duty to provide shop drawings. In addition, Mortenson was required to certify, when submitting shop drawings to HDR, not only that Mortenson had reviewed, checked and approved the shop drawings but also that the shop drawings conformed to the detailed requirements of the drawings and specifications. The contract goes on to provide that conformance of the shop drawings to the contract documents should be the *sole* responsibility of Mortenson and the failure of the shop drawings to so conform was to be at the *sole* risk of Mortenson even when the shop drawings had already been reviewed by HDR. Unless Mortenson had noted on the shop drawings submitted any deviation from the contract documents and requested a change order, submission of the shop drawings constituted a waiver of all Mortenson's right to seek additional compensation.

Here there is no question that Mortenson did not request a change order and that it has waived any right to seek additional com-

---

**2.** I cannot construe Article 15 to require indemnity only with respect to claims arising out of work performed by the contractor or its subcontractors or material suppliers, as does the majority. When read in the context of the construction contract, Article 15 seems to me to limit the right of indemnity to claims by Mortenson, its subcontractors, suppliers, material people, and other agents and consultants. Even if, however, for purposes of the discussion concerning the required connection between National Hydro's alleged economic injury and the indemnification agreement, we accept the majority's construction as correct, the required connection is clearly present.

pensation. However, it is Mortenson's subcontractor, National Hydro, not Mortenson, that seeks additional compensation, alleging that HDR was negligent in the preparation of its drawings and specifications. What National Hydro rather conveniently overlooks is the fact that HDR owes it no duty with respect to the preparation of its drawings and specifications. HDR has no contractual relationship with National Hydro. HDR is not a party to the construction contract between the Commission and Mortenson although HDR is expressly made a third party beneficiary of the indemnity provision set out at Article 15 of that contract. Had HDR negligently prepared its drawings and specifications and thereby caused the Commission to incur additional construction costs by reason of change orders, the Commission could and undoubtedly would have complained of HDR's negligent breach of its contractual duty to the Commission. There is, however, no basis for compelling HDR to perform that duty for the economic benefit of National Hydro, an entity that is not a party to either the construction contract or HDR's contract with the Commission. HDR had no duty to prepare its drawings and specifications or review the shop drawings submitted by Mortenson in a manner which would protect National Hydro's anticipated profit on its agreement with Mortenson. As Professor Pollock put it a little more than 65 years ago, "[N]egligence in the air, so to speak, will not do." P. Landon, Pollock's Law of Torts 361 (14th ed. 1939).

If it is National Hydro's position that it stands in Mortenson's shoes when it performs Mortenson's work pursuant to the construction contract and that HDR therefore owes it, as Mortenson's alter ego, a duty of reasonable care in the preparation of the project drawings and specifications and in its review of the shop drawings of the clarifiers, then National Hydro must recognize that it cannot cloak itself with Mortenson's benefits under the contract without also assuming Mortenson's burdens. The construction contract between the Commission and Mortenson required Mortenson to perform all of the following tasks:

[R]eview all Drawings and Specifications prior to starting work. Any discrepancies found between the Drawings and Specifications and site conditions, or any inconsistencies or ambiguities in the Drawings and Specifications, shall be immediately reported to the CAR [Commission's Authorized Representative] in writing. Work done by the CONTRACTOR after its discovery of such discrepancies, inconsistencies, or ambiguities, and prior to correction by the CAR, shall be done at the CONTRACTOR's risk. * * * *

Art. 4, § 4.2, Constr. Contract. Although National Hydro now complains that HDR's drawings and specifications were ambiguous and inconsistent so that National Hydro could not prepare shop drawings in conformance with them, neither Mortenson nor National Hydro reported any ambiguities or inconsistencies to the CAR. Rather, shop drawings were prepared and submitted with a "T" design bridge instead of the "star" design bridge specified by the project drawings and specifications. Section 4.7.2 requires Mortenson's certification that the shop drawings conformed to the contract requirements. Section 4.7.5 provides that conformance of the shop drawings with the detailed requirements of the project drawings and specifications is the sole responsibility of Mortenson and a failure to conform is at Mortenson's sole risk with no right to additional compensation for work or other action necessary to make them conform, unless, as provided by Section 4.7.6, Mortenson notes the deviation, indicates the reason for the proposed change, and requests a change order. Failure to request a change order constitutes a waiver of all rights to additional compensation. Art. 4.7, § 4.7.6, Constr. Contract. No change order was requested. National Hydro now complains that Mortenson did not request a change order and that it could not compel Mortenson to make such a request. If, however, National Hydro wishes to stand in Mortenson's shoes in order to claim a relationship with HDR which would justify imposition on HDR of a duty toward National Hydro, then it must walk the entire mile in Mortenson's shoes and acknowledge its obligation to request a change order on Mortenson's behalf or to demand that Mortenson make the request in order to assure

the proper performance of the subcontract. Having failed to request a change order, Mortenson and National Hydro have waived any right they may otherwise have had and neither of them is entitled to a second bite.

Finally, the majority characterizes as equivocal the indemnification provision found at Article 15 of the construction contract. Article 15 sets out, however, Mortenson's agreement to indemnify and hold HDR harmless from and against all claims, legal actions, extra costs and losses and expenses "whether founded in breach of contract, negligence, or pursuant to Contract provisions or howsoever premised * * * which arise out of * * * performance of the WORK by" Mortenson and its subcontractors, including "claims and demands of Subcontractors." Art. 15, §§ 15.1, 15.1.4, Constr. Contract. Once it is recognized that National Hydro's claim arises directly out of its work on the project, the contract language appears to me quite clear and unequivocal. The nature of HDR's presence on this construction project does not place it in a relationship with any other person or entity present at the project that would subject HDR to vicarious liability for another's negligence. Accordingly, the only actual function of the indemnification clause is to indemnify HDR for its own negligence. There is no basis for ascribing to the provision any other meaning.

Although I am of the opinion that the law and the construction industry were on the whole better served by the rules of fair construction adopted in *Northern Pac. Ry. Co. v. Thornton Bros. Co.*, 206 Minn. 193, 288 N.W. 226 (1939), and consistently applied for 40 years than by the rule of "strict construction" adopted in *Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838 (Minn.1979), nevertheless, I do not understand the *Farmington Plumbing* opinion to advocate rewriting the parties' contract under the guise of "strict construction"—an interpretation which the majority has today accorded it. While there may be good reason to strictly construe an indemnity provision foisted on a subcontractor by a powerful construction company, the wide disparity in bargaining power which may be cited as justification for judicial intervention is noticeably missing in this case.

For the foregoing reasons I would reverse the decision of the court of appeals and reinstate the judgment of the district court.