**HEDGED INVESTMENT PARTNERS, L.P., et al., Respondents,**

v.

**NORWEST BANK MINNESOTA, N.A., Appellant.**

**No. C3–97–2060.**

Court of Appeals of Minnesota.

May 12, 1998.

David R. Marshall, Steven J. Quam, Fredrikson & Byron, P.A., Minneapolis, for respondents.

William Z. Pentelovitch, Wayne S. Moskowitz, Maslon, Edelman, Borman & Brand, LLP, Minneapolis, for appellant.

Considered and decided by CRIPPEN, P.J., and LANSING and PETERSON, JJ.

## OPINION

LANSING, Judge.

On cross-motions for summary judgment in a dispute involving a series of wire transfers, the district court granted summary judgment for Hedged Investment Partners and its general managing partner, Blue Rock Investment Advisors. The district court de-

nied Norwest's summary judgment motions. Norwest appeals, and we affirm in part, reverse in part, and remand.

## FACTS

Hedged Investment Partners (HIP) is a Minnesota limited partnership formed to make investments in minimum amounts of $100,000 on behalf of third parties. In September 1993 HIP and Norwest Bank executed an "Agency Agreement" in which Norwest agreed to perform certain wire transfer services and also to perform duties designated as "trustee" services.

At the time, HIP had two general partners, Blue Rock Advisors, Inc., a Minnesota corporation, and P. Michael Trautner. Blue Rock served as HIP's Managing General Partner. Trautner served as HIP's Consulting General Partner and as president, director, and 50-percent owner of Blue Rock. In this capacity, Trautner signed the Agency Agreement on behalf of Blue Rock.

The Agency Agreement imposed obligations on both HIP and Norwest. HIP's Managing General Partner, Blue Rock, agreed to:

Provide Norwest with a list of HIP's current General and Limited Partners and a list of HIP's current Investment Advisors.

When Blue Rock added Investment Advisors, it would provide Norwest with (a) copy of the new advisor's private placement memorandum or investment advisory agreement, (b) wire instructions for the advisor's designated bank, and (c) verification from the new advisor that HIP's account at Norwest is the only fund transfer destination for withdrawals.

Execute all money transfers (deposits and withdrawals) for HIP through its account at Norwest.

Use "Form B" to the Agency Agreement to direct Norwest to transfer HIP's funds to the Investment Advisors and to Blue Rock.

Under the Agreement, Norwest assumed two types of duties—the duty to provide wire transfer services and the duty to provide certain substantive fiduciary duties. In a section entitled "Initial Structure," Norwest agreed to provide the following procedures:

Retain on file a copy of the Limited Partners' signatures provided by Blue Rock and use it to verify Limited Partner communications.

Retain on file a letter agreement from each Investment Advisor certifying that all withdrawals of HIP's assets would only be transferred to Norwest.

Retain on file the copies of the private placement memoranda or managed account agreements between HIP and its Investment Advisors provided by Blue Rock.

In another section, entitled "Allocations to additional Investment Advisors," Norwest agreed to check each new investment advisor's wire instructions by calling the advisor at the location provided by the placement memorandum or advisory agreement. In the final section of the Agreement, labeled "The Trustee," Norwest also agreed to examine all exhibits and documents received under the Agreement to determine whether they conformed to the Agreement's requirements.

The sequence of the sections in the Agency Agreement is difficult to follow, suggesting deletions or adaptations from a more complete contract. The record indicates that the Agency Agreement was adapted from an earlier agreement between Norwest and another limited partnership in which Trautner and Fullerton were the general partners. A major investor in that limited partnership fashioned the controls that were incorporated into the agreement to protect the flow of money out of the partnership. We find nothing in the record to suggest that a limited partner in HIP or in Blue Rock requested or knew of the control procedures in the Agency Agreement. HIP paid Norwest an annual fee of $4,000 to perform the Agency Agreement functions.

Neither party fully performed its obligations. HIP failed to provide Norwest with a copy of its Limited Partnership Agreement, a list of HIP's current limited partners and general partners, the signatures of HIP's limited partners, or a list of HIP's current investment advisors. As HIP added investment advisors, HIP did not provide Norwest

with copies of placement memoranda, investment advisory agreements, and other required documents.

Norwest also failed to meet its obligations. The employees who routinely transferred funds were not aware of the required procedures or any other terms of the Agency Agreement. Upon receipt of a direction to transfer funds, the employees looked to see if Trautner or Robert Fullerton, another Blue Rock officer and director, had signed it. The employees then determined whether HIP's account had sufficient funds and made the transfer. In October 1994, the Norwest employee who made the wire transfers from June 1994 to August 1995 performed an internal yearly review encompassing the Agency Agreement. Although he concluded that all funds "had been invested in accordance with the documents," he later testified that he never reviewed any documents to determine Norwest's compliance.

While the agreement was in force, Norwest made 26 transfers totaling more than $5 million to bank accounts of seven entities, none of which were properly authorized under the Agency Agreement. This litigation is limited to 19 wire transfers totaling $449,-000 to Truck Alignment Corporation of America (TACA), authorized by Trautner from June 1994 to August 1995.[1]

After discovering the TACA transfers, Fullerton demanded and received Trautner's resignation from HIP and Blue Rock on August 29, 1995. HIP sued TACA to recover the transferred funds but had obtained no recovery as of January 6, 1998. After TACA defaulted, HIP sued Norwest for breach of contract and breach of its contractual fiduciary duty. HIP alleged that Norwest was liable for the default due to its failure to follow the Agency Agreement's wire transfer procedures. Norwest denied liability and asserted a third-party complaint against Blue Rock.

Norwest appeals the entry of summary judgment in favor of HIP's breach of contract and fiduciary duty claims and challenges the entry of summary judgment dismissing its claims against Blue Rock. Norwest also appeals the district court's amended judgment awarding damages to Blue Rock.

## ISSUES

I. Does Article 4A exclude a common law action for breach of fiduciary duties provided in the contract between Norwest and HIP?

II. Did the district court err in ruling that waiver and modification were unavailable as contract defenses or in failing to consider other common law contract defenses?

III. Did the district court err in finding that the agreement between Norwest and HIP was a security procedure and analyzing the allocation of liability to determine whether it was "verified" under Minn.Stat. § 336.4A–202(b) rather than "authorized" under Minn.Stat. § 336.4A–202(a)?

IV. Did the district court err in denying Norwest's motion for summary judgment on its third-party claims against Blue Rock or in granting summary judgment and money damages for Blue Rock?

## ANALYSIS

A litigant is entitled to summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that judgment may be entered as a matter of law. Minn. R. Civ. P. 56.03. In an appeal from summary judgment, the reviewing court must determine "whether a genuine issue of material fact exists, and whether an error in the application of the law occurred." *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn.1995).

The district court concluded that Article 4A governed the wire transfers between

---

1. Minn.Stat. § 336.4A–505 (1996) precludes a customer from claiming that a bank is not entitled to retain payment unless the claim is made within one year of notification. The district court determined that the bank was notified in October 1995 and held that HIP could not recover losses that occurred before October 1994. That ruling has not been appealed.

Norwest and HIP, that the Agency Agreement constituted a "security procedure" in accordance with Minn.Stat. § 336.4A–201 (1996), and that Norwest accepted payment orders without verifying them in compliance with the security agreements and is required to bear the loss of the wire transfers. The district court also concluded that the defenses of waiver and modification did not apply. Finally, the court concluded Norwest was not entitled to indemnity or contribution from Blue Rock and the doctrine of circuity did not apply.

## I

Minnesota's appellate courts have not addressed the extent to which Article 4A of the Minnesota's U.C.C. governing "funds transfers" or "wire transfers" excludes common law claims. Enacted in 1990 with an effective date of January 1, 1991, Minn.Stat. §§ 336.4A–101–.4A–507 regulate electronic funds transfers, a specialized method of payment initiated when a person directly transmits an instruction to a bank either to make payment to a designated beneficiary or to instruct another bank to make payment to the beneficiary. Minn.Stat. § 336.4A–104 (1996). The sender's instruction is a payment order to the receiving bank that is reimbursed by debiting the sender's account. Minn.Stat. § 336.4A–103 (1996).

Minn.Stat. § 336.4A–101 is essentially identical with section 4A–101 of the Uniform Commercial Code. Minn.Stat. Ann. § 336.4A–101 U.C.C. cmt. (West Supp.1998). Prior to the drafting of Article. 4A, judicial authority on funds transfer was sparse, undeveloped, and nonuniform. Judicial resolution of funds transfer disputes had to rely on common law, equity, or analogy to other statutorily regulated payment methods. Minn.Stat. Ann. § 336.4A–102 U.C.C. cmt. (West Supp. 1998). These sources failed to provide a consistent framework to predict risk, adjust operations and security procedures, and provide a basis for fairly pricing funds transfer services. Article 4A addressed these problems and provided a uniformity that assigned responsibility and allocated risks. Id. Because Article 4A was designed to balance competing interests of the providers of funds transfer services, users of the services, and the public interest, it was intended to be exclusive with respect to its provisions. Id. Consequently, the purpose of Article 4A is undermined by resort to principles of law or equity outside of 4A to create rights, duties, and liabilities inconsistent with Article 4A. Id.

When analyzing exclusivity principles in relation to other Uniform Commercial Code provisions, the Minnesota Supreme Court has emphasized the value of maintaining an independent system of commercial rules. See Superwood Corp. v. Siempelkamp Corp., 311 N.W.2d 159, 162 (Minn.1981) (legislature did not intend for tort law to circumvent U.C.C.'s statutory scheme) (overruled on other grounds). The court has extended the U.C.C.'s commercial exclusivity when the foundational assumptions of the U.C.C. require displacement of common law theory. See Hapka v. Paquin Farms, 458 N.W.2d 683, 688 (Minn.1990) (U.C.C. must control exclusively with respect to damages in a commercial transaction); Impulse Trading, Inc. v. Norwest Bank Minnesota, N.A., 907 F.Supp. 1284, 1288–89 (D.Minn.1995) (interpreting Minnesota's Article 4A to preempt common law when conflicting or duplicative).

Other courts have applied a similar analysis in addressing the scope of 4A's exclusivity. In Centre–Point Merchant Bank Ltd. v. American Express Bank Ltd., a federal district court interpreting New York law rejected the argument that the New York legislature intended for Article 4A "to replace the common law entirely with regard to wire transfers." 913 F.Supp. 202, 206 (S.D.N.Y. 1996). Adopting the reasoning of Sheerbonnet, Ltd. v. American Express Bank, Ltd., the Centre–Point court concluded that the exclusivity of Article 4A is "deliberately restricted" to situations covered by its specific provisions. Id. (citing Sheerbonnet, 905 F.Supp. 127 (S.D.N.Y.1995)); 951 F.Supp. 403, 407 (S.D.N.Y.1996) (amending earlier decision); see also General Elec. Capital Corp. v. Central Bank, 49 F.3d 280, 286 (7th Cir.1995) (interpreting Wisconsin law as applying common law "discharge for value" rule to state's version of Article 4A); Banque Worms v. BankAmerica Int'l, 928 F.2d 538, 541 (applying New York Court of Appeals conclusion that "discharge for value rule"

applies to electronic funds transfer cases); *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 548–49, 570 N.E.2d 189, 196–97 (Ct.App.1991) ("discharge for value rule," a common law doctrine, is consistent with policy objectives underlying Article 4A). *But see Banco de la Provincia de Buenos Aires v. Baybank Boston N.A.,* 985 F.Supp. 364, 371 (S.D.N.Y.1997) (Article 4A does not preclude common law claim unless such claim is inconsistent with its provisions); *MRF Resources Ltd. v. Merchants Bank,* 222 A.D.2d 355, 636 N.Y.S.2d 26, 28 (1995) (applying specific provision of Article 4A to deny counterclaim for consequential damages); *Aleo Int'l, Ltd. v. Citibank, N.A.,* 160 Misc.2d 950, 612 N.Y.S.2d 540, 541 (N.Y.Sup.1994) (Article 4A preempts negligence action when specific provisions govern alleged claim).

Commentators also recognize the importance of maintaining an integrated system governing wire transfers and importing other law only when the transaction exceeds the scope of the article. *See generally* J.J. White & R.S. Summers, Uniform Commercial Code, § 22 at p. 4 (4th ed. 1995) ("With the adoption of Article 4A, electronic funds transactions are governed not only by Article 4A, but also by common law, contract, Federal Reserve rules, Federal Reserve operating letters, rules of automated clearing houses, CHIPS, and Title IX of the Federal Consumer Credit Protection Act* * *. Article 4A is comprehensive but at the same time not comprehensive.").

 Relying on *Impulse Trading,* the district court ruled that Article 4A "only preempts common law claims to the extent that the parties do not have a 'special relationship.'" We analyze Article 4A's exclusivity differently. Drawing from the comments and the developing case law, we conclude that the exclusivity of Article 4A is restricted to situations that are covered by particular provisions of the Article and that principles of law and equity may be applied to disputes relating to funds transfers so long as those principles do not create rights, duties, or liabilities inconsistent with those stated in the Article. The Agency Agreement between HIP and Norwest covers specific fiduciary responsibilities that go well beyond the scope of wire transfer services. These contractual responsibilities do not create rights, duties, or liabilities inconsistent with Article 4A, but in addition to it. Consequently, we conclude that the contractual responsibilities are not excluded by Article 4A.

These duties include (1) retaining on file a letter agreement from each investment advisor certifying that all withdrawals of HIP's assets would only be transferred to Norwest; (2) retaining on file the copies of the private placement memoranda or managed account agreements between HIP and its investment advisors provided by Blue Rock; and (3) examining all exhibits and documents received under the Agency Agreement to determine whether they conformed to the Agreement's requirements. Liability for losses resulting from Norwest's failure to perform these responsibilities is, for the most part, extraneous to the remedial provisions of Article 4A and Norwest's liability for breach turns on common law principles of contract and agency law.

## II

The district court directly addressed and rejected several of Norwest's common law contractual defenses. We recognize that on remand the analysis will shift considerably because of the restructure necessitated by a fuller approach to the contract issues and to the agency principles addressed in section III. But we discuss the waiver analysis for the purpose of allowing a more efficient determination of this issue on remand.

 Waiver is the intentional relinquishment of a known right and is consensual in nature. *Carlson v. Doran,* 252 Minn. 449, 456, 90 N.W.2d 323, 328 (1958). While knowledge may be actual or constructive, intention can be inferred from conduct. *Id.* Estoppel results from conduct that causes another party to change its position in reliance on the contract. *Wolff v. McCrossan,* 296 Minn. 141, 145, 210 N.W.2d 41, 44 (1973); *Malmquist v. Peterson,* 149 Minn. 223, 226, 183 N.W. 138, 140 (1921). *See also Engstrom v. Farmers & Bankers Life Ins. Co.,* 230 Minn. 308, 312–13, 41 N.W.2d 422, 424–25 (1950) (citations omitted) (waiver and estoppel are often confused but the concepts are not interchangeable). A course-of-con-

duct waiver is based on the theory of estop-pel and requires detrimental reliance. _See Steinhilber v. Prairie Pine Mut. Ins. Co._, 533 N.W.2d 92, 93–94 (Minn.App.1995) (defining modification by course of conduct); _see also Wolff_, 296 Minn. at 145, 210 N.W.2d at 44 (same); _Malmquist;_ 149 Minn. at 226, 183 N.W. at 140 (same).

Because the Norwest employees making the transfers were not aware of the terms of the Agency Agreement, the district court correctly concluded that a course-of-conduct waiver or modification did not occur. However, the district court did not determine whether HIP in fact _waived_ the agreement. _See Kennedy v. Hasse_, 262 Minn. 155, 161, 114 N.W.2d 82, 86 (1962) (defendant waived right to exercise the release-clause provision of a purchase agreement for plaintiff's hardware store by continuing to exercise ownership, ordering merchandise, paying employees, and operating the business after he knew the plaintiffs could not fully perform the agreement). Because a full waiver analysis must consider concepts of agency not explored by the district court, we reverse and remand on this issue. _See McGee v. Breezy Point Estates_, 283 Minn. 10, 17–21, 166 N.W.2d 81, 87–89 (1969) (plaintiff's business representative had apparent authority to modify the contract because plaintiffs conducted all business with defendants through him, they never advised defendants of any limits on his authority, and he negotiated contract terms); _see also_ Minn.Stat. § 323.08 (1996) ("[T]he act of every partner * * * for apparently carrying on in the usual way the business of the partnership binds the partnership, unless the partner so acting has in fact no authority to act in the particular matter, and the person with whom that partner is dealing has knowledge * * * that the partner has no such authority."); Minn.Stat. §§ 322A.26, 322A.33 (limited partners typically have no right to participate in management or operation); _Kress Road Partnership v. Chicago Title & Trust Co._, 134 B.R. 292, 299–300 (Bankr.N.D.Ill.1991) (trustee-agent not liable for breach of fiduciary duty when it acted at direction of general partner in limited partnership and there were no facts alleged or pleaded that trustee-agent knew or had any reason to know general partner was not authorized to exercise its power of direction.)

We also remand for consideration of Norwest's contract defenses of impediment to contract, _see In re Hennepin County 1986 Recycling Bond Litigation_, 540 N.W.2d 494, 502 (Minn.1995); indemnity, _see Tolbert v. Gerber Industries, Inc._, 255 N.W.2d 362, 366 (Minn.1977); and contribution, _see Farmers Ins. Exchange v. Village of Hewitt_, 274 Minn. 246, 253, 143 N.W.2d 230, 235 (1966). In addition to its contribution and indemnity claims against Blue Rock, Norwest argues that a circuity of obligation exists in this case because at least 11 of HIP's 13 limited partners have entered into an agreement and release with HIP and Blue Rock concerning the TACA notes. Therefore, any recovery will go to Blue Rock, which, as HIP's managing general partner, would be liable to Norwest under the equitable doctrines of liability or contribution.

A circuity of obligation exists when the plaintiff is obligated to indemnify the defendant for claims, including the plaintiff's own claims, by virtue of pre-existing indemnity agreements or obligations. _National Hydro Systems v. M.A. Mortenson Co._, 529 N.W.2d 690, 693 (Minn.1995). "[A] finding of circuity of obligation will defeat a plaintiff's claim as a matter of law." _Id._ If it is determined on remand that Norwest is entitled to indemnification, we believe these assignments create a circuity of obligation that would defeat HIP's claim. Consequently, we reverse and remand the determination on circuity of obligation.

### III

To avoid responsibility for fraudulent transfers under Article 4A of Minnesota's Commercial Code, a financial institution must establish that a transfer is "authorized" under Minn.Stat. § 336.4A–202(a) _or_ "verified" under section 336.4A–202(b):

> A payment order received by the receiving bank is the _authorized order_ of the person identified as the sender if that person authorized the order or is otherwise bound by it under the law of agency.

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be *verified pursuant to a security procedure,* a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized * * *.

Minn.Stat. § 336.4A–202(a) and (b) (1996) (emphasis added). Although the format of 4A–202 creates some confusion, a careful reading of 4A–202(a) and 4A–202(b) shows that these subsections are freestanding alternative methods to ascertaining whether a payment order is authentic. The Uniform Commercial Code Comment following section 4A–203 describes the relationship between "authorized" and "verified" payment orders:

> Section 4A–202 reflects the reality of the wire transfer business. A person in whose name a payment order is issued is considered to be the sender of the order if the order is "authorized" as stated in subsection (a) or if the order is "verified" pursuant to a security procedure in compliance with subsection (b). If subsection (b) does not apply, the question of whether the customer is responsible for the order is determined by the law of agency. The issue is one of actual or apparent authority of the person who caused the order to be issued in the name of the customer. * * * Under Section 4A–202, the issue of liability of the purported sender of the payment order will be determined by agency law only if the receiving bank did not comply with subsection (b).

Minn.Stat. Ann. § 336.4A–203 U.C.C. cmt. (West Supp.1998).

Whether we analyze the allocation of liability under 4A–202(a) or 4A–202(b) turns on whether the procedures outlined in the Agency Agreement constitute a "security procedure" under Article 4A:

> "Security procedure" means a procedure established by agreement of a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication * * * is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication. A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar security devices. Comparison of a signature on a payment order or communication with an authorized specimen signature of the customer is not by itself a security procedure.

Minn.Stat. § 336.4A–201 (1996). The comment to section 201 elaborates on this definition, noting that the above definition limits the term to a procedure established by agreement between the customer and the receiving bank. Minn.Stat. Ann. § 336.4A–201 U.C.C. cmt. (West Supp.1998). Additional guidance appears in the comment to section 202(b):

> Subsection (b)(ii) also requires the bank to prove that it complied with any agreement or instruction that restricts acceptance of payment orders issued in the name of the customer. * * * *The customer may provide the bank with a list of authorized beneficiaries and prohibit acceptance of any payment order to a beneficiary not appearing on the list. Such limitations may be incorporated into the security procedure itself or they may be covered by a separate agreement or instruction. In either case, the bank must comply with the limitations if the conditions stated in subsection (b) are met.*

Minn.Stat. Ann. § 336.203 U.C.C. cmt. (West Supp.1998) (emphasis added). While a receiving bank generally has the burden of providing commericially reasonable security procedures, the customer has the burden "to supervise its employees to assure compliance with the security procedure and to safeguard confidential security information and access to transmitting facilities." *Id.*

The district court concluded the duties undertaken by Norwest constituted a security procedure as defined in Minn.Stat. § 336.4A–201. We disagree. We read Norwest's contractual duties as an agreement to determine whether the payment orders were properly *authorized* under Minn.Stat. § 336.4A–202(a) by (1) retaining on file a copy of the Limited Partners' signatures provided by Blue Rock and using it to verify Limited Partner communications; and (2) checking each new Investment Advisor's wire instructions by calling the advisor at the location provided by

the private placement memorandum or advisory agreement.

■ Although it is tempting to treat "authorized payment orders" and "verified payment orders" as interchangeable, the concepts are quite different. The concept of an "authorized payment order" is rooted in traditional banking transactions in which there is some type of personal contact between the sender and the receiving bank. In these situations, the customer's liability for losses resulting from unauthorized transfers turns on the questions of agency—specifically, whether the sender had actual or implied authority to issue the order in the customer's name:

> In some cases, the law of agency works well. For example, suppose the receiving bank executes a payment order given by means of a letter apparently written by a corporation that is a customer of the bank and apparently signed by an officer of the corporation. If the receiving bank acts solely on the basis of the letter, the corporation is not bound as the sender of the payment order unless the signature was that of the officer and the officer was authorized to act for the corporation in the issuance of payment orders, or some other agency doctrine such as apparent authority or estoppel causes the corporation to be bound. * * * Other equitable principles such as subrogation or restitution might also allow a receiving bank to recover with respect to an unauthorized payment order that it accepted.

Minn.Stat. Ann. § 346.4A–203 U.C.C. cmt. (West Supp.1998).

By contrast, a "verified payment order" is a distinct concept, designed for situations in which there is no personal contact between the sender and the receiving financial institution. Because it is far more difficult to determine whether an electronic message is properly authorized, the receiving bank must instead determine whether the payment order is *authentic*. To make this determination, the financial institution and the customer must adopt a commercially reasonable security procedure:

> In a very large percentage of cases covered by Article 4A, transmission of the payment order is made electronically. The receiving bank may be required to act on

the basis of a message that appears on a computer screen. Common law concepts of authority of agent to bind principal are not helpful. There is no way of determining the identity or the authority of the person who caused the message to be sent. The receiving bank is not relying on the authority of any particular person to act for the purported sender. The case is not comparable to payment of a check by the drawee bank on the basis of a signature that is forged. Rather, the receiving bank relies on a security procedure pursuant to which the authenticity of the message can be "tested" by various devices which are designed to provide certainty that the message is that of the sender identified in the payment order. In the wire transfer business the concept of "authorized" is different from that found in agency law. In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test.

Minn.Stat. Ann. § 346.4A–203 U.C.C. cmt. (West Supp.1998).

■ The responsibilities Norwest assumed that are covered under Article 4A fit squarely within the concept of "authorization" under Minn.Stat. § 346.4A–202(a). The payment orders in question were transmitted in writing from a known source with whom the bank had personal contact. By agreeing to check the signatures of the limited partners and check the wire instructions provided by new investment advisors, Norwest agreed to determine whether the payment orders were *authorized*. These responsibilities did not establish a commercially reasonable method of determining whether the payment orders were *authentic*. Because the district court incorrectly characterized these responsibilities as a security procedure, we reverse and remand for a determination of liability based on Minn.Stat. § 346.4A–202(a). This analysis necessarily reaches the issue of agency. But we note that even if the Agency Agreement had met the definition of a security procedure, agency principles would still have been relevant to the extent the Agency Agreement constituted a written agreement restricting acceptance of payment orders.

*See* Minn.Stat. § 346.4A–202(b) (requiring proof of good faith acceptance, compliance with security procedures, and compliance with any written agreement restricting acceptance of payment order).

## IV

Although the district court correctly denied Norwest's motion for summary judgment on its third-party claim against Blue Rock, it incorrectly granted summary judgment in favor of Blue Rock without addressing whether Blue Rock waived relevant terms of the Agency Agreement and, if so, whether Blue Rock had the authority to do so. These questions must be addressed on remand.

Finally, the district court incorrectly awarded damages to Blue Rock despite the fact that Blue Rock did not request them. Therefore, we affirm the court's denial of Norwest's summary judgment against Blue Rock and reverse its grant of summary judgment and damages award in favor of Blue Rock.

## DECISION

Principles of exclusivity do not prevent consideration of HIP's claims for breach of contract or breach of a contractually defined fiduciary duty. Although the district court correctly looked to Article 4A to determine liability for loss on wire transfers, the court incorrectly analyzed liability under Minn. Stat. § 336.4A–202(b) rather than 202(a) and failed to determine whether HIP, Blue Rock, or Trautner authorized the transfers at issue under the law of agency.

We reverse the district court's grant of summary judgment in favor of HIP and remand for further consideration. We affirm the denial of Norwest's summary judgment motion on its claims against HIP. The district court correctly denied Norwest's motion for summary judgment as to its third-party claims against Blue Rock, but we reverse the district court's grant of summary judgment in favor of Blue Rock against Norwest.

**Affirmed in part, reversed in part, and remanded.**