# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1713
_____

Harleysville Insurance Company

*Plaintiff - Appellant*

v.

Physical Distribution Services, Inc.,
doing business as Labor Services Company;
Miller Transporters, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 16, 2012
Filed: May 2, 2013

_____

Before RILEY, Chief Judge, COLLOTON and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

This diversity jurisdiction[1] case hinges on the interpretation under Minnesota law of two contractual provisions. The first is an indemnification clause in a contract

_____

[1]See U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1332.

between Physical Distribution Services, Inc. (PDSI)[2] and Miller Transporters, Inc. (Miller). The second is a provision in an insurance contract between Harleysville Insurance Co. (Harleysville) and PDSI which extends insurance coverage to PDSI's indemnification of third parties for tort liability "caused, in whole or in part, by [PDSI] or by those acting on [PDSI's] behalf." Harleysville brought a declaratory judgment action pursuant to 28 U.S.C. § 2201 seeking a declaration of its obligations to PDSI and Miller under the insurance contract. The district court[3] granted summary judgment in favor of PDSI and Miller, holding (1) the indemnification clause required PDSI to indemnify Miller for liability it incurred from injury to a leased employee and (2) the insurance provision required Harleysville to cover the resulting cost to PDSI. Harleysville appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I. BACKGROUND

A. Facts

In 1989, PDSI, a Minnesota company which provides employees under lease agreements with transportation firms, entered into an employee leasing agreement with Miller, a Mississippi based trucking company. Miller and PDSI believed their leasing agreement remained in force on the date of the incident at issue in this case. From December 1, 2006 to December 1, 2007, PDSI had general commercial liability insurance from Harleysville, a Pennsylvania company.

On September 6, 2007, a PDSI employee named Jonathan Hughes fell ten or eleven feet while working as a tank washer at a Miller truck maintenance facility in Nitro, West Virginia. On the day of the fall, PDSI's "lead man" at the Nitro facility,

---

[2]PDSI has done business as "Labor Services Company," and various documents in the record refer to the company by that moniker. The parties' briefs consistently refer to the company as PDSI, and we do the same in this opinion.

[3]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

Edward Chapman, was one of Hughes' supervisors. Although supervisory authority overlapped between Chapman and Miller in some respects, PDSI directed Hughes' and its other employees' daily activities based on decisions by Miller employees. When Hughes fell, the Miller employee serving as the Nitro facility's maintenance supervisor was not present,[4] and Hughes considered Chapman to be "in charge." Hughes testified Chapman was the person who "instructed" Hughes to perform the task which led to his fall—cleaning resin out of a chemical tanker.

Cleaning resin out of a chemical tanker required a team of two people—one person inside the tank to remove the resin and put the resin in five-gallon buckets; and one person outside the tank to carry the resin filled buckets from a platform on top of the tanker to the dumping area below. The outside worker would climb to the top of the tanker using a stationary ladder, transition to a mobile A-frame ladder, grab a resin filled bucket, and climb down the A-frame ladder. The outside workers followed this practice because the stationary ladder was perfectly vertical, making it easier and more comfortable to descend backward down the angled A-frame ladder.

On the day of the fall, Hughes took the role of outside worker at Chapman's instruction while Chapman himself worked inside the tank. After a trip or two up and down the ladders, Hughes reached the platform on top of the tanker, shifted to the A-frame ladder, and grabbed a resin filled bucket. This time, the weight of the bucket caused him to falter. Hughes began to fall, and the A-frame ladder kicked out from underneath him. As he fell to the concrete floor ten or eleven feet below, his head hit the A-frame ladder. He landed "almost flat," mostly on his lower left side, injuring his lower back, hip, and left leg. Hughes testified the fall caused him recurring pain, including in the lower back, and affected his walking gait.

---

[4]Hughes believed Miller's maintenance supervisor, Tony Rich, had left for the day, but Rich testified he was in Mississippi the day Hughes fell.

The mechanics' bay where the fall occurred did not have fall protection (e.g., a cable from which workers could tie a harness) or a stationary stairway to provide access to the tankers. Ed Bowman, a PDSI employee leased to Miller, said he and other PDSI employees working in Nitro were instructed to "tie-off[] and retract[]" (i.e., use fall protection) whenever they were working more than four feet off the ground. But the equipment to do so was only available in the wash rack, and not in the mechanics' bays where resin cleaning took place. Well before Hughes fell, at least one PDSI employee working at the Nitro facility expressed safety concerns to Miller employee Wilson Tollett, who at the time was terminal manager of the Nitro facility. Tollett relayed the concerns to his Miller supervisors, who replied, "It is rolling stock." Tollett told Bowman "the company said [putting fall protection and permanent stairs in the mechanics' bays] was too much money."

Hughes sued Miller in West Virginia state court for (1) negligently failing "to provide a reasonably safe workplace," and (2) intentionally exposing him to unsafe working conditions in violation of West Virginia law.[5] Miller tendered the suit to PDSI. PDSI notified Harleysville of the suit on April 23, 2010, and asked Harleysville to defend the case and indemnify Miller. On May 21, 2010, Harleysville denied coverage, taking the position that the general commercial liability insurance policy PDSI obtained from Harleysville did not cover Hughes' suit against Miller. On April 12, 2011, Miller notified PDSI that it had reached an agreement with Hughes to settle all claims for $300,000 and demanded that PDSI "fulfill its indemnity obligations" by reimbursing Miller $300,000 for the settlement plus $104,337 in legal fees. On April 14, 2011, Miller notified Harleysville of the settlement and demanded indemnification. On May 26, 2011, Hughes signed an agreement with Miller settling his claims for $300,000.

---

[5]See W. Va. Code §§ 21-3-1 to -21, 23-4-2.

**B. Procedural History**

On June 24, 2010, in the District of Minnesota, Harleysville filed the complaint against PDSI and Miller giving rise to this appeal. Harleysville sought a judgment declaring (1) PDSI was not obligated to indemnify Miller for Hughes' injuries, and (2) PDSI's general commercial liability insurance policy from Harleysville did not cover PDSI's indemnification liability to Miller. Miller counterclaimed, asking the district court to declare PDSI was obligated to indemnify Miller and Harleysville was obligated to cover the indemnification.[6]

The disagreement between the parties centered on two sets of contractual language, both of which, the parties agree, must be evaluated under the substantive law of Minnesota. First, the 1989 agreement between PDSI and Miller contained the following paragraph:

> MILLER shall maintain adequate insurance for fire, theft or other casualty on its terminal(s) and/or shop(s). [PDSI] hereby indemnifies and saves MILLER harmless from any and all claims, actions, or causes of action in any way relating to personnel assigned to MILLER, including, but not limited to, personal injury, workers compensation, third party claims, Social Security, unemployment compensation, and taxes or other required withholding of whatever nature. [PDSI] shall obtain insurance against any and all of the above mentioned risks and shall name MILLER as an additional insured requiring that at least fifteen (15) days notice be given to Miller [sic] of any change in coverage or any anticipated cancellation of said policy(ies). [PDSI] shall provide

---

[6]In the district court, PDSI initially took the position that (1) PDSI was not obliged to indemnify Miller for Miller's own negligence, but (2) Harleysville was obliged to cover PDSI to the extent it was liable to Miller under the indemnification agreement. PDSI has since abandoned the former position. PDSI and Miller now agree that their 1989 agreement requires PDSI to indemnify Miller for the expenses related to Hughes' suit.

MILLER with certificates of insurance necessary to demonstrate compliance with these obligations.

Second, the insurance policy contained the following provisions:

1. **Insuring Agreement**
   a. [Harleysville] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Harleysville] will have the right and duty to defend the insured against any "suit" seeking those damages . . . .
   . . . .

2. **Exclusions**
   This insurance does not apply to:
   . . . .

   b. **Contractual Liability**
   "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does *not* apply to liability for damages:
   . . . .

   (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.
   . . . .

9. "Insured contract" means:
   . . . .

   f. That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, *provided the "bodily injury" or "property*

-6-

*damage" is caused, in whole or in part, by you or by those acting on your behalf.* Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

(Emphasis added).

After discovery, each party moved for summary judgment. The district court denied Harleysville's motion and granted PDSI's and Miller's motions in part. First, the district court found Hughes' "lawsuit fell squarely within the indemnity provision of the Agreement between PDSI and Miller." Second, the district court interpreted the insurance policy as requiring Harleysville to cover costs arising from the Hughes lawsuit because the policy's "insured contract" clause required no "more than 'but for' causation." "[B]ut for PDSI's employment of Hughes . . . , Hughes would not have been injured," the district court explained. The district court also noted, "individuals acting on PDSI's behalf . . . at least partially caused the bodily injury that Hughes sustained, as the term 'caused' is construed by the Court for purposes of the Policy."

On January 30, 2012, the district court ordered (1) PDSI to indemnify Miller for the $300,000 settlement of Hughes' suit in West Virginia; (2) Harleysville to cover the settlement; and (3) the parties to "negotiate, in good faith, resolution of Miller's claim for reimbursement of $104,337 in attorney fees." Harleysville agreed $104,337 in fees "could be entered into the judgment," but Miller sought additional fees incurred after the settlement with Hughes. On February 23, 2012, the district court denied Miller's request for additional fees, and the following day the district court entered judgment against Harleysville, ordering Harleysville to reimburse Miller $404,337 (i.e., $300,000 for the settlement and $104,337 for the legal fees incurred in reaching the settlement). Harleysville appeals.

## II. DISCUSSION

On appeal, "[w]e review [a] district court's decision on cross-motions for summary judgment *de novo*." Dunn v. Aamodt, 695 F.3d 797, 799 (8th Cir. 2012). The meaning of the contractual provisions at issue in this case presents a question of Minnesota law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Iowa Kemper Ins. Co. v. Stone, 269 N.W.2d 885, 886-87 (Minn. 1978). If the Minnesota Supreme Court "has not decided an issue" of Minnesota law, "it is [our] task . . . to predict how the" Minnesota Supreme Court "would resolve the issue." United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003). In making this prediction, we are not bound by the decisions of Minnesota's intermediate appeals courts, but a Minnesota Court of Appeals decision "is a datum for ascertaining [Minnesota] law which is not to be disregarded by [us] unless [we are] convinced by other persuasive data that the [Minnesota Supreme Court] would decide otherwise." West v. AT&T Co., 311 U.S. 223, 237 (1940); see, e.g., Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 883 (8th Cir. 2000).

### A. Indemnification

The district court found Hughes' suit "fell squarely within the indemnity provision of the [1989] Agreement between PDSI and Miller." We agree.

When applying Minnesota law, we strictly construe indemnification agreements that shift liability for the indemnitee's own negligence. See, e.g., Farmington Plumbing & Heating Co. v. Fischer Sand and Aggregate, Inc., 281 N.W.2d 838, 842 (Minn. 1979).[7] An indemnification provision will only be enforceable if its language is "clear and unequivocal." Nat'l Hydro Sys. v. M.A. Mortenson Co., 529 N.W.2d 690, 694 (Minn. 1995). Notice is the mainspring of an enforceable indemnification

---

[7]As applied to building and construction contracts signed after August 1, 1984, Farmington is superseded by Minn. Stat. § 337.02. See Katzner v. Kelleher Const., 545 N.W.2d 378, 381 (Minn. 1996).

provision—to shift liability, an indemnification provision must "fairly apprise[] [the indemnitor] of an obligation to indemnify [the indemnitee]." Yang v. Voyagaire Houseboats, Inc., 701 N.W.2d 783, 791-92 n.5 (Minn. 2005). The plain meaning of the provision in this case was "clear and unequivocal" enough to put PDSI on notice of its obligation to indemnify Miller for bodily injury to PDSI's employees, even if Miller's own negligence caused the bodily injury. See Nat'l Hydro Sys., 529 N.W.2d at 694.

Harleysville argues Yang renders the indemnification provision in this case unenforceable under Minnesota law. Harleysville's reliance on Yang is misplaced. The Minnesota Supreme Court decided Yang on the public policy ground that a guest is never liable for an innkeeper's negligence. See Yang, 701 N.W.2d 791-92. The inferences Harleysville draws from a footnote[8] in Yang are mistaken. Properly read in context, the footnote simply reaffirmed settled Minnesota law that an indemnification agreement must be "clear and unequivocal," Nat'l Hydro Sys., 529 N.W.2d at 694. See Yang, 701 N.W.2d at 791-93. In stark contrast to PDSI, the indemnitor in Yang was an individual who signed a rental agreement he professedly "did not understand." Id. at 786. The corporate indemnitee in Yang sought to hold the individual indemnitor liable for the corporate indemnitee's *prior* negligence. Id. at 791-92 & n.5. The Yang provision was insufficient to "fairly apprise[]" the individual indemnitor of potential liability for negligence by the corporation occurring before the agreement was signed. Id. By contrast, the parties in this case are sophisticated businesses who fully understood the terms of the agreement, and the indemnification provision gave PDSI clear notice of an obligation to indemnify Miller for future personal injury claims arising from Miller's negligence. When it signed the 1989 agreement, PDSI believed it had such an obligation, and, as its present litigation posture shows, it interprets the agreement the same way today as it did in 1989.

[8]See Yang, 701 N.W.2d at 791-92 n.5 ("Although our emphasis here is on the public policy factors, we also determine that the indemnification clauses are not enforceable because the language is not clear and unequivocal.").

The language of the indemnification provision broadly encompasses and specifically includes Hughes' personal injury claims.[9] Unless "any" does not mean *any* or "personal injury" does not mean *personal injury*, we see nothing equivocal about this provision. See, e.g., Webster's Third New International Dictionary 97, 1686 (1993) (defining "any" as "one, no matter what one" and "personal injury" as "an injury affecting one's physical and mental person as contrasted with one causing damage to one's property" and "an injury giving rise to a personal action at law"). We decline Harleysville's invitation "to manufacture ambiguity where none exists." United States v. Culbert, 435 U.S. 371, 379 (1978); see also Hammer v. Investors Life Ins. Co. of N. Am., 511 N.W.2d 6, 8 (Minn. 1994).

The indemnification agreement in this case, which is enforceable under Minnesota law, requires PDSI to indemnify Miller for Hughes' settlement.[10]

---

[9]"[PDSI] hereby indemnifies and saves M[iller] harmless from *any and all* claims, actions, or causes of action *in any way* relating to personnel assigned to M[iller], including, but not limited to, *personal injury*." (Emphasis added).

[10]Because the indemnification agreement in this case was not "contained in, or executed in connection with, a building and construction contract," Minn. Stat. § 337.02, we need not determine how the requirement that PDSI "obtain insurance" affects the agreement's enforceability. See Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co., 825 N.W.2d 695, 711 n.13, 713-14 (Minn. 2013). Compare Minn. Stat. § 337.02 (rendering unenforceable indemnification agreements that shift liability for an indemnitee's own negligence in building and construction contexts), with id. § 337.05, subd. 1 (exempting "agreements whereby a promisor agrees to provide specific insurance coverage for the benefit of others" from § 337.02's blanket invalidation).

**B.    Insurance**

The district court interpreted the insurance agreement as requiring Harleysville to cover Miller's settlement of Hughes' claims.  We agree.

### 1.    Causation Under Minnesota Law

Harleysville challenges causation under the clause covering PDSI's assumption of Miller's "tort liability . . . [for] 'bodily injury' . . . to a third person or organization."  The policy limits Harleysville's coverage to "'bodily injury' . . . *caused, in whole or in part*, by [PDSI] or by those acting on [PDSI's] behalf." (Emphasis added).  The district court interpreted the phrase "caused, in whole or in part," to require "but for" causation.  Unsurprisingly, PDSI and Miller agree with the district court's interpretation.  Harleysville argues the phrase "caused, in whole or in part" requires some "form of direct or proximate causation."  When we heard oral argument in this case, Bolduc, 825 N.W.2d at 695, was pending before the Minnesota Supreme Court, and the parties agreed the Bolduc decision might indicate how the Minnesota Supreme Court would interpret the causal language at issue in this case. See id.  We deferred deciding this case until the Minnesota Supreme Court issued its decision in Bolduc.

With the benefit of Bolduc, we discern two strands in Minnesota's interpretation of causal language in insurance contracts.  First, under Minnesota law, the phrase "arising out of" requires "but for" causation.  See, e.g., Faber v. Roelofs, 250 N.W.2d 817, 822-23 (Minn. 1977).  Second, under Minnesota law, the phrase "caused by acts or omissions" contains a fault requirement.  See Bolduc, 825 N.W.2d at 708.  Miller and PDSI propose this case falls within the first strand, while Harleysville maintains it falls into the second.  But the simple fact is that the text at issue here—"caused, in whole or in part"—contains neither the words "arising out of" nor the words "caused by acts or omissions."  Thus, neither Faber nor Bolduc directly answers the contractual interpretation question posed by this case.

Our task, then, is to predict how the Minnesota Supreme Court would interpret the precise contractual language at issue here. See United Fire, 328 F.3d at 413. In making this prediction, we decline the parties' invitation to wade into a dense thicket of over-parsed distinctions between individual phrases extracted, without context, from various Minnesota Supreme Court decisions. Instead, we rely—as we expect the Minnesota Supreme Court would—on fundamental principles of Minnesota law. First, we give "[u]nambiguous words . . . their 'plain, ordinary, and popular meaning.'" Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009) (quoting Minn. Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 179 (Minn. 1990)). Second, we "'read and stud[y] [provisions in an insurance contract] independently and in context with all other relevant provisions and the language of the policy as a whole.'" Westchester Fire Ins. Co. v. Wallerich, 563 F.3d 707, 712 (8th Cir. 2009) (quoting West Bend Mut. Ins. Co. v. Armstrong, 419 N.W.2d 848, 850 (Minn. Ct. App. 1988)); see also Cement, Sand & Gravel Co. v. Agric. Ins. Co. of Watertown, N.Y., 30 N.W.2d 341, 345 (Minn. 1947). Third, in interpreting contractual language, we do not abandon our "'common sense.'" Westchester Fire, 563 F.3d at 712 (quoting Mutual Serv. Cas. Ins. Co. v. Wilson Twp., 603 N.W.2d 151, 153 (Minn. Ct. App. 1999)).

### 2. Facts Show Causation

Applying these principles to this case, we conclude the undisputed facts establish as a matter of law that PDSI or "those acting on [PDSI's] behalf" at least partly "caused" Hughes' "'bodily injury'" within the terms of Harleysville's policy.

### a. Plain Meaning

Our conclusion flows, first, from the "plain, ordinary, and popular meaning," Minn. Mining, 457 N.W.2d at 179, of the operative words in the insurance policy. The undisputed facts show Chapman, PDSI's "lead man" at the Nitro facility, acted

"on behalf of" PDSI.[11]  See, e.g., Webster's Third New International Dictionary 198 (1993) (defining "on behalf of" as "in the interest of," "as the representative of," and "for the benefit of").  Although Harleysville makes much of the facts that Chapman's supervisory authority overlapped with the authority of Miller supervisors on site and Chapman directed the PDSI employees in accordance with Miller's directions, these facts do not bear the enormous weight Harleysville places upon them.  Viewing these facts in Harleysville's favor, we cannot reasonably infer the overlap in supervisory

---

[11]Because our analysis relies on Chapman's role in partly causing Hughes' injuries, we need not decide whether Hughes himself was acting "on behalf of" PDSI.  To the extent Harleysville separately argues the PDSI employees at the Miller site did not act on PDSI's behalf, an argument which Harleysville bases on the "loaned servant" doctrine as outlined in Nepstad v. Lambert, 50 N.W.2d 614 (Minn. 1951), we reject that argument.  As our court has previously noted, on questions of Minnesota law, "Nepstad is not controlling because it applied Wisconsin law."  Lundstrom v. Maguire Tank, Inc., 509 F.3d 864, 867 (8th Cir. 2007).  Harleysville has not cited a single case interpreting Minnesota's loaned servant doctrine.  Cf., e.g., Danek v. Meldrum Mfg. & Eng'g Co., 252 N.W.2d 255, 258 (Minn. 1977) (considering "for the first time the 'loaned-servant doctrine' with respect to that subclass of general employers known as labor brokers, who supply temporary workers to special employers").

Harleysville's "loaned servant" argument would fail even if it had cited a relevant case because Harleysville misinterprets the scope and application of the doctrine.  Under Minnesota law, the loaned servant doctrine provides that an employee of a "general" employer may, in certain circumstances, be considered an employee of the "special" employer to whom she is loaned.  Id. The loaned servant doctrine expands liability rather than constricts it—both general and special employers become liable for compensating the injured worker.  Id.

Minnesota law does not support Harleysville's argument, the Wisconsin law interpreted in Nepstad does not apply, and Harleysville has waived any argument that West Virginia law might control the issue.  See, e.g., Portell v. AmeriCold Logistics, LLC, 571 F.3d 822, 826 n.3 (8th Cir. 2009) (holding an argument not raised in opening brief "is waived").

-13-

authority meant Chapman was no longer acting "in the interest of," "as the representative of," or "for the benefit of" PDSI.  The only reasonable interpretation of the record is Chapman worked "on behalf of" PDSI by complying with PDSI's contractual obligation to provide certain services to Miller—a task that necessarily required taking some directions from Miller.

Accepting Harleysville's contention to the contrary would require us to say (1) consultants working with a client no longer work "on behalf of" their consulting firm if the consultants follow the client's instruction to remove sensitive information from a report; or (2) a computer business technician who travels to a company to fix a broken computer no longer works "on behalf of" his computer business if the technician fixes a particular computer as directed by the company's receptionist or secretary.  The summary judgment standard is generous to the non-movant, but it does not require us to forego common sense.  See Westchester Fire, 563 F.3d at 712.

The undisputed facts also show Chapman partly "caused" Hughes' injuries by instructing Hughes to perform the task which led to the injuries—clean resin out of a chemical tanker in a bay using high ladders without fall protection or a fixed stairway.  See American Heritage Dictionary of the English Language 295 (5th ed. 2011) (defining "caused" as "[t]o be the cause of or reason for; result in"); Webster's Third New International Dictionary 356 (1993) (defining "cause" as "to serve as cause or occasion of" or to "bring into existence");[12] see also id. at 1648 (defining "partly" as "in some measure or degree").  By instructing Hughes to work outside the chemical tanker in unsafe conditions, Chapman "in some measure" brought Hughes' injuries "into existence."[13]  That much is plain.

---

[12]The Minnesota Supreme Court relied on precisely these definitions to interpret the word "caused" in Bolduc.  See 825 N.W.2d at 708.

[13]That Chapman partly caused Hughes' injuries is not to say Chapman and PDSI were necessarily negligent, but Chapman's instruction to Hughes—an

-14-

### b. Policy as a Whole

Second, "the policy as a whole," Cement, Sand & Gravel, 30 N.W.2d at 345, supports our plain reading of the particular provisions at issue in this case. Aside from the causation requirement, the policy as a whole places few limits on Harleysville's obligation to cover insured contracts like the one between PDSI and Miller. In sharp contrast to the insurance contract interpreted by the Minnesota Supreme Court in Bolduc, the contract in this case does not exclude coverage for the indemnitee's "independent acts or omissions," Bolduc, 825 N.W.2d at 705-06. Neither does Harleysville's contract exclude the category of damages at issue, unlike the contract in Bolduc. Cf. id. at 709-10. Harleysville's reliance on Bolduc is misplaced.

To be sure, the Minnesota Supreme Court in Bolduc interpreted an additional insured provision to cover only an indemnitee's vicarious liability for the indemnitor's fault. Id. at 707. But the Bolduc court expressly noted its interpretation was "properly based on [its] reading of the *precise wording* of the [Bolduc] provision as a whole, in the context of th[e] *particular* insurance policy [at issue in Bolduc]." Id. at 707 n.8 (emphasis added). The Minnesota Supreme Court reached its conclusion through a process of elimination—the Bolduc contract covered only vicarious liability because the insurance contract expressly excluded coverage for every other form of liability.[14] Id. at 707-10. Of particular relevance to this case, the Bolduc contract excluded coverage for the indemnitee's direct liability (i.e., liability imposed "when one party

---

instruction given on PDSI's behalf—moves beyond but-for causation. We thus find it unnecessary to specify the exact level of causation required by PDSI's insurance contract with Harleysville.

[14]Unlike this case, Bolduc involved property damage. See Bolduc, 825 N.W.2d at 707. The Minnesota Supreme Court found only three ways the indemnitee in Bolduc could become liable for property damage: (1) direct liability, (2) vicarious liability for the indemnitor's fault, and (3) contractual liability to a third party. See id. at 707-09. The Bolduc contract expressly excluded coverage for the first and third paths to liability. See id. at 710.

has breached a personal duty . . . through his own negligence," <u>Sutherland v. Barton</u>, 570 N.W.2d 1, 5 (Minn. 1997)). <u>See</u> <u>Bolduc</u>, 825 N.W.2d at 707. And in <u>Bolduc</u>, a jury found the indemnitor was not negligent. <u>See</u> <u>id.</u> at 701. This case differs on both counts. PDSI's insurance contract with Harleysville does not exclude coverage for Miller's liability to Hughes. And though Miller settled Hughes' claims, no jury has found either PDSI or Miller not negligent. Both PDSI and Miller now agree that PDSI partly "caused" Hughes' injuries.

Far from excluding coverage for PDSI's liability to Miller, other parts of the policy impliedly *include* such coverage. Although the policy broadly excludes coverage for bodily injury to "[a]n 'employee' of the insured arising out of and in the course of . . . [e]mployment by [PDSI]," the policy expressly exempts PDSI's liability to Miller from this exclusion: "[t]his exclusion does not apply to liability assumed by the insured under an 'insured contract.'" The policy ordinarily would exclude coverage for Hughes' bodily injuries because he was a PDSI employee. <u>Cf.</u> <u>id.</u> at 709-10. But the policy expressly did not apply this exclusion to contractually assumed liabilities, which strongly implies the contract covers PDSI's contractually assumed liability for bodily injuries to PDSI employees. Because the liability at issue in this case arises directly from PDSI's agreement with Miller, the contract covers Hughes' injuries despite the fact that the injuries occurred while Hughes was working for PDSI. On the whole, the policy covers PDSI's liability to Miller for Hughes' settlement.

###     c.     Common Sense

Third, "[c]ommon sense tells us" our plain reading of the insurance contract is correct. <u>Engel v. Redwood Cnty. Farmers Mut. Ins. Co.</u>, 281 N.W.2d 331, 332 (Minn. 1979). Both PDSI and Harleysville were sophisticated parties—each was in the business of providing products and services in exchange for fees according to terms set by contract. In this context, common sense weighs most heavily in favor of giving the parties the benefits—and misfortunes—of the clear terms of their bargain. Here

there is no notable imbalance of power or experience, and Harleysville is hardly the less sophisticated party. Harleysville's business is to write and sell contracts of the sort we are interpreting here. Having sold PDSI—a company in the business of contracting workers to other entities—a commercial general liability insurance policy which by its plain terms covers contractually assumed liability for injury to PDSI's workers, Harleysville now asks our court to deny PDSI coverage for contractually assumed liability for injury to a PDSI worker. We decline to adopt Harleysville's reading of the policy. We give the Harleysville insurance contract a "sound, common sense construction," <u>Sleeter v. Progressive Assur. Co.</u>, 253 N.W. 531, 533 (Minn. 1934), and hold Harleysville must cover PDSI's liability to Miller for Hughes' injuries.

## III. CONCLUSION

Applying Minnesota law, we affirm.

COLLOTON, Circuit Judge, dissenting.

In my view, a straightforward application of the Minnesota Supreme Court's jurisprudence concerning indemnification clauses establishes that the 1989 agreement between Physical Distribution Services, Inc. (PDSI) and Miller Transporters, Inc., does not require PDSI to indemnify Miller for Miller's own negligence. I would therefore reverse the judgment of the district court.

As the court acknowledges, Minnesota courts "strictly construe indemnification agreements that shift liability for the indemnitee's own negligence," and an indemnification clause will be enforced only if it is "clear and unequivocal." *Ante*, at 8 (citing *Farmington Plumbing & Heating Co. v. Fischer Sand and Aggregate, Inc.*, 281 N.W.2d 838, 842 (Minn. 1979) and *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995)). The Minnesota Supreme Court's recent decision in *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783 (Minn. 2005), shows what the

-17-

Minnesota court requires to make an indemnification provision "clear and unequivocal."

In *Yang*, the Minnesota court considered two indemnification clauses in a houseboat rental agreement. The clauses provided as follows:

> I further agree at my cost and expense, to defend and save Voyagaire Houseboat[s] harmless on account of any and all suits or demands brought or asserted by reason of injuries to any person, persons or property whatsoever caused by the use or operation of said equipment while in my possession . . . .

> Renter shall indemnify and hold harmless Owner from and against all claims, actions, proceedings, damage and liabilities, arising from or connected with Renter's possession, use and return of the boat, or arising at any time during the term of this rental.

*Id.* at 791 (alteration in original).

The Minnesota Supreme Court held the clauses unenforceable on two alternative grounds, one of which informs our analysis of this case. After concluding that the provisions were contrary to public policy, the Minnesota court determined alternatively that "the indemnification clauses are not enforceable because the language is not clear and unequivocal." *Id.* at 791-92 n.5. The court explained that "[s]trictly construed, the indemnification clauses do not contain language that (1) specifically refers to negligence, (2) expressly states that the renter will indemnify Voyagaire for Voyagaire's negligence, or (3) clearly indicates that the renter will indemnify Voyagaire for negligence occurring before the renter took possession of the houseboat." *Id.* The court also rejected the suggestion that "the requirement of clear and unequivocal language concerning the scope of the indemnification clause[s] applies only in the context of building and construction contracts." *Id.*

-18-

The indemnification clause at issue in this case provides:

> [PDSI] hereby indemnifies and saves M[iller] harmless from any and all claims, actions, or causes of action in any way relating to personnel assigned to M[iller], including, but not limited to, personal injury.

It follows from *Yang* that the language of this clause is insufficient to require PDSI to indemnify Miller for its own negligence. The clause does not contain language that refers to negligence, and it does not expressly state that PDSI will indemnify Miller for Miller's negligence.

The majority believes that the broad language of the clause in this case, referring to "any" claim relating to "personal injury," makes the indemnification clear and unequivocal. This would be a fine argument if we were interpreting a federal statute or applying a federal common law of contracts, but Minnesota law on indemnification clauses is to the contrary. The clauses in *Yang* included comparable language that referred to "*any and all suits* or demands brought or asserted by reason of *injuries to any person*," and to "*all claims . . . arising from or connected with* Renter's possession, use and return of the boat." *Id.* at 791 (emphasis added). Yet the Minnesota court held that "the language" of the indemnification clause was "not clear and unequivocal." *Id.* at 791-92 n.5. The court's holding did not depend on the sophistication of the parties, *cf. ante*, at 9; it focused on *the language* of the contract. Nor did *Yang* depend on the fact that the indemnification clause extended to the indemnitee's "prior negligence," *ante*, at 9; if that were so, then the *Yang* court's first two reasons for rejecting the indemnification agreement would have been superfluous.

In effect, the Minnesota court has adopted a plain statement rule for indemnification clauses that purport to cover an indemnitee's own negligence. To be effective, the clause must refer to negligence and must state expressly that the

-19-

contracting party will indemnify the other party for its own negligence. Those elements are absent here, and PDSI is thus not required to indemnify Miller for personal injuries caused by Miller's own negligence.

For these reasons, I would reverse the judgment of the district court and remand for further proceedings.

_____