# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-1739

_____

Feed Management Systems, Inc.

*Plaintiff - Appellant*

v.

Comco Systems, Inc.; Comco Manufacturing, Ltd.

*Defendants - Appellees*

_____

No. 15-1840

_____

Feed Management Systems, Inc.

*Plaintiff - Appellee*

v.

Comco Systems, Inc.; Comco Manufacturing, Ltd.

*Defendants - Appellants*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 17, 2015
Filed: May 23, 2016

_____

Before SMITH, BYE, and BENTON, Circuit Judges.[1]

_____

SMITH, Circuit Judge.

In July 2008, Feed Management Systems, Inc. (FMS) and Comco Systems, Inc. ("Comco") entered into an agreement ("Management Agreement"). Among other things, the Management Agreement obligated Comco to broadly indemnify FMS as well as reimburse FMS for reasonable costs and expenses, including attorneys' fees. After Comco refused to indemnify FMS in a lawsuit involving non-parties Brilliant Alternatives, Inc. and Robert Brill (collectively, "Brill"), FMS sued Comco for reimbursement of attorneys' fees and other expenses that resulted from the lawsuit. FMS and Comco filed cross-motions for summary judgment. The district court[2] granted both motions in part. FMS and Comco each appeal. We affirm.

## I. *Background*

Before entering into the Management Agreement, FMS and Comco each had dealings with Brill. In January 2008, Comco entered into an agreement with Brill ("Comco–Brill Agreement") to acquire Brill's rights to certain software products related to animal feed management and an international distribution network of sales agents. During the Comco–Brill Agreement negotiations, and after its execution, FMS defended itself in litigation filed against it by Brill. Comco entered the Comco–Brill

_____

[1]This opinion is being filed by Judge Smith and Judge Benton pursuant to 8th Cir. Rule 47E.

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Agreement, in part, to assume control of the litigation. In return for control over the litigation and the acquisition of Brill's above-listed rights, Comco agreed to market and distribute the software and pay Brill royalties and a contractor fee.

In exercising its control over the ongoing litigation between FMS and Brill, Comco took over settlement negotiations with FMS from Brill. During the negotiations, FMS and Comco discussed the potential for a business relationship. Ultimately, the settlement discussions resulted in the Management Agreement. As part of the Management Agreement, Comco "appoint[ed] FMS . . . to render management services to [Comco] pursuant to the terms of [the Management] Agreement." These management services included (i) "billing, collecting, and paying the agents which comprise the [d]istribution [n]etwork," and (ii) "providing work direction to Brill . . . in order to enable Brill to fulfill [its] obligations under the [Comco–Brill] Agreement." Unsurprisingly, because of its history with Brill, FMS insisted on broad protections against any litigation that Brill might bring. To address this concern, the Management Agreement required Comco to indemnify FMS

> from and against any and all losses, costs, expenses, claims, damages and liabilities whatsoever . . . to which [FMS] may become subject under any applicable law, or any claim made by any third party, or otherwise, to the extent they relate to or arise out of or in connection with the performance of the Services contemplated by this Agreement or the engagement of FMS pursuant to, and the performance by FMS of the Services contemplated by, this Agreement.

Comco also agreed to reimburse FMS for "all reasonable costs and expenses (including reasonable attorneys' fees and expenses . . . ) as they are incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim for which [FMS] would be entitled to indemnification . . . or any action or proceeding arising therefrom." FMS and Comco agreed that these provisions

-3-

would survive the termination of the Management Agreement. On March 16, 2009, FMS terminated the Management Agreement.

By this point, Comco had already severed its relationship with Brill and was engaged in litigation initiated by Brill. After Comco reached a settlement with Brill at the end of July 2009, Brill brought suit against FMS on August 27, 2009 ("Brill–FMS Litigation"). Brill alleged that the Management Agreement was an impermissible assignment of Comco's rights and obligations under the Comco–Brill Agreement and that FMS engaged in intentional misconduct under the Management Agreement.

Shortly after Brill filed its complaint against FMS, FMS tendered defense to Comco pursuant to the indemnification provision of the Management Agreement. Comco rejected FMS's tender, arguing that the claims that Brill asserted were outside the scope of the indemnity provision. Specifically, Comco argued that the claims did not relate to the performance of services listed in the Management Agreement and enforcing indemnification would violate public policy because FMS was accused of intentional misconduct. FMS responded to Comco's refusal, noting its disagreement with Comco's position and reserving its right to seek indemnification and reimbursement for defense costs and fees. Consequently, FMS sought coverage from its insurer, Scottsdale Indemnity Company ("Scottsdale"). Scottsdale accepted the tender on November 19, 2009. Scottsdale agreed to FMS's request that Bowman and Brooke, LLP serve as lead counsel but required FMS to pay any amounts exceeding the approved partner rate.

While the Brill–FMS Litigation was ongoing, Cargill, Inc. ("Cargill") purchased FMS and assumed control of the litigation after the merger. Cargill, however, did not contribute to defraying the cost of the litigation. Instead, Cargill, FMS, and FMS's Series A Stockholders "agreed to establish a joint defense fund to provide for the defense and settlement of the [Brill–FMS] Litigation." To establish

-4-

the joint defense fund, these companies set aside $500,000 that would otherwise have been paid to the Series A Stockholders.

Nearly three years after the Brill–FMS Litigation began, FMS prevailed in having all of Brill's claims dismissed on summary judgment, but the cost of the defense was substantial. Bowman and Brooke alone billed $1,077,880.30. Three other law firms also provided services. Nall & Miller, LLP served as local counsel, billing a total of $10,667.56. Soffer Charbonnet Law Group, PLLC ("Soffer Charbonnet") assisted FMS in seeking indemnification from Scottsdale and Comco and billed $19,350.00. Lommen Abdo, P.A. billed $25,917.50 for representing the Series A Stockholders during the Cargill merger. The total cost of the defense was $1,133,815.36 in attorneys' fees, costs, and other expenses.[3]

At the end of January 2013, FMS sought reimbursement from Comco for the full cost of the Brill–FMS Litigation. Comco maintained its position that it was not required to indemnify or reimburse FMS under the Management Agreement because of the nature of the claims that Brill asserted. Approximately two months later, FMS brought this breach-of-contract suit against Comco. FMS and Comco filed cross-motions for summary judgment. The district court granted partial summary judgment in favor of both FMS and Comco, holding that Comco was obligated to (1) indemnify FMS against claims brought by Brill, and (2) reimburse FMS for $87,350 in attorneys' fees and other expenses but not the entire $1,133,815.36 that FMS claimed. FMS and Comco each appeal the judgment of the district court.

---

[3]Together, FMS, the Series A Stockholders, and Scottsdale paid for the total cost of the Brill–FMS Litigation. Of the $1,088,547.86 billed by Bowman and Brooke and Nall & Miller, FMS paid $68,000; Scottsdale paid $859,144.69; and the Series A Stockholders paid $161,403.17. In addition, FMS paid the full amount billed by Soffer Charbonnet, and the Series A Stockholders paid the full amount billed by Lommen Abdo. In total, Scottsdale paid $859,144.69, the Series A Stockholders paid $187,320.67, and FMS paid $87,350.

## II. *Discussion*

We review de novo the district court's decision on cross-motions for summary judgment. *Dunn v. Aamodt*, 695 F.3d 797, 799 (8th Cir. 2012). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The case is before us on diversity jurisdiction, and by the terms of the Management Agreement, Minnesota law governs. Under Minnesota law, "[t]he meaning of an indemnity clause, like the construction of any other written contract, is a question of law." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) (citation omitted).

### A. *Indemnification*

Comco takes issue with the district court's determination that the Brill–FMS Litigation is within the scope of the Management Agreement's indemnity provision. Comco argues that it is only obligated "to indemnify FMS for claims that arise out of (1) FMS's performance of 'services' under the Agreement, i.e., billing and paying agents, and providing work direction for Brill, [or] (2) the engagement of FMS to perform such services." According to Comco, neither category encompasses the Brill–FMS Litigation. Building on this point, Comco further argues that it was not obligated to indemnify FMS because Brill's claims in the Brill–FMS Litigation alleged intentional misconduct.

When interpreting a contract, Minnesota courts "look to its language to determine the parties' intent." *Savela v. City of Duluth*, 806 N.W.2d 793, 796 (Minn. 2011) (citation omitted). "Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004) (citation omitted). Minnesota courts assign unambiguous contract language its plain meaning and refrain from rewriting, modifying, or limiting its effect by a strained construction. *Id.*

The indemnification provision in the Management Agreement states that Comco will indemnify FMS

> from and against any and all losses, costs, expenses, claims, damages and liabilities whatsoever . . . to which [FMS] may become subject under any applicable law, or any claim made by any third party, or otherwise, to the extent they relate to or arise out of or in connection with the performance of the Services contemplated by this Agreement or the engagement of FMS pursuant to, and the performance by FMS of the Services contemplated by, this Agreement.

As a preliminary matter, we do not find the language ambiguous.[4] The indemnification provision covers any third-party claim that relates to, arises out of, or is connected with the engagement or duties of FMS under the Management Agreement. Although the language is broad, ambiguity does not inhere in breadth. *See Latterell v. Progressive N. Ins. Co.*, 801 N.W.2d 917, 921 (Minn. 2011) (explaining that "just because contractual language is broad does not mean it is ambiguous").

When the indemnity provision is applied to the Brill–FMS Litigation, the claims asserted therein plainly fall within the ambit of the provision. Comco points to five of Brill's claims in support of its argument:

> 1. FMS intentionally interfered with the contract and business relationship between Brill and Comco by inducing Comco to terminate Brill's contract with Comco;
>
> 2. FMS committed fraud at a meeting in August 2008 by intentionally failing to disclose material facts;

---

[4]It is unclear whether this is in dispute. In its brief, Comco refers to the language of the indemnity provision as both "ambiguous" and "clear and unambiguous."

3. FMS misappropriated business opportunities through issuance of its own press releases;

4. FMS was unjustly enriched through receiving information from Brill that was "not used by Comco" but instead used by FMS for personal gain; and

5. Brill is an intended third-party beneficiary of the Comco-FMS contract.

(Citations omitted and bold omitted.) Yet, on closer examination, all of these claims related to, arose out of, or were connected "with . . . the engagement of FMS pursuant to, and the performance by FMS of the Services contemplated by" the Management Agreement. Sections 2(a) and 2(c) of the Management Agreement charged FMS with "providing work direction to Brill as an independent contractor to [Comco]" and gave FMS "exclusive discretion and authority to determine the manner in which it provides Services pursuant to [the Management] Agreement."

In Brill's complaint, the intentional interference claim is based upon FMS "gaining unfettered access to the [d]istribution [n]etwork" pursuant to the Management Agreement. Likewise, the claims for fraud and unjust enrichment are based upon occurrences that took place at a meeting held pursuant to the Management Agreement. The misappropriated-business-opportunity claim is based upon actions that FMS took that allegedly transferred benefits from Comco to FMS wrongfully "pursuant to the . . . Management Agreement." Finally, the third-party beneficiary claim asserts that Brill is an intended third-party beneficiary "of the . . . Management Agreement." Brill's complaint allegations reveal that Brill's dispute arose from the Management Agreement.

We reject Comco's assertion that the plain language of the indemnity provision excludes the Brill–FMS Litigation. Comco asks us to strictly construe the

indemnification language because it shifts liability for FMS's own misconduct. Under a strict construction, Comco argues that the provision does not clearly and unequivocally shift liability from FMS to Comco. Specifically, Comco contends that the provision does not cover the Brill–FMS Litigation because it does not expressly cover actions arising out of FMS's own misconduct.

"When applying Minnesota law, we strictly construe indemnification agreements that shift liability for the indemnitee's own negligence." *Harleysville Ins. Co. v. Physical Distribution Servs., Inc.*, 716 F.3d 451, 457 (8th Cir. 2013) (citation omitted). Indemnification provisions that shift liability "are not favored by the law and are not construed in favor of indemnification unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed to it." *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995) (quotation and citation omitted). "Notice is the mainspring of an enforceable indemnification provision—to shift liability, an indemnification provision must 'fairly apprise[] [the indemnitor] of an obligation to indemnify [the indemnitee].'" *Harleysville*, 716 F.3d at 457 (alterations in original) (quoting *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791–92 n.5 (Minn. 2005)).

Comco's urging notwithstanding, we decline to strictly construe the indemnity provision. As the district court noted, "the provision did not actually shift liability for misconduct by FMS . . . because FMS was not found liable for the conduct that Brill alleged." Minnesota law directs courts to strictly construe indemnity provisions "when the indemnitee . . . seeks to be indemnified for its own negligence," *Nat'l Hydro Sys.*, 529 N.W.2d at 694 (alteration in original) (quotation and citation omitted), not when a complaint merely alleges such misconduct. *See Seifert v. Regents of Univ. of Minn.*, 505 N.W.2d 83, 85–86 (Minn. Ct. App. 1993) (holding that allegation of negligence did not invalidate indemnity provision where the record did not support a finding of negligence). An indemnity provision holds harmless an indemnitee from certain actions and consequences. Unless clearly and unequivocally

provided, Minnesota law excludes an indemnitee's own misconduct from the range of actions and consequences covered. Importantly, it is the indemnitee's conduct that triggers strict construction. The purpose behind strictly construing an indemnity provision—preventing an indemnitor from becoming an unwitting insurer—is absent here. The record does not support a finding that FMS committed any of the misconduct alleged by Brill.

Even if we were to strictly construe the provision, our decision in *Harleysville* forecloses Comco's argument. In *Harleysville*, we strictly construed a provision that indemnified an indemnitee "from any and all claims, actions, or causes of action in any way relating to personnel assigned to [the indemnitee], including, but not limited to, personal injury." 716 F.3d at 458 n.9 (quotation and emphases omitted). We held that this broad "provision gave [the indemnitor] clear notice of an obligation to indemnify [the indemnitee] for future personal injury claims arising from [the indemnitee's] negligence." *Id.* at 458. When confronted at oral argument with *Harleysville*, counsel for Comco did not attempt to distinguish *Harleysville* or explain why it did not apply. Instead, counsel asked that we reject the holding in *Harleysville* as incorrectly decided. We do not find any meaningful distinction between the broad indemnity provision at issue in *Harleysville* and the broad indemnity provision at issue here, and thus, we are bound by the holding in *Harleysville*.

The district court correctly interpreted the indemnity provision as covering the Brill–FMS Litigation.

## B. *Reimbursement*

FMS argues that the district court erred in limiting its recovery to the $87,350 that it paid out of pocket. FMS contends that the plain language of the Management Agreement requires Comco to reimburse it for the entire $1,133,815.36 in fees, costs, and expenses that resulted from the Brill–FMS Litigation. FMS further argues that the district court erred in holding that it could not pursue recovery as "the real party

-10-

in interest because its losses include and exceed the amounts Scottsdale and the Series A [Stockholders] contributed." Finally, FMS points to the subrogation provision in its insurance policy with Scottsdale and its oral agreement to reimburse the Series A Stockholders as evidence that it would not receive a windfall were it allowed to recover the entire $1,133,815.36.

The Management Agreement obligated Comco to "pay and reimburse, on demand, [FMS] for all reasonable costs and expenses (including reasonable attorneys' fees and expenses, which may be required to be paid in advance) as they are incurred in connection with [any indemnified liability]." Comco breached this provision when it rejected FMS's tender because the Management Agreement required Comco to pay for FMS's defense costs "*as they are incurred*" or, if required, "in advance." (Emphasis added.)

"The rule of the common law is that where a party sustains a loss by reason of a breach of contract, he is, so far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed." *Paine v. Sherwood*, 21 Minn. 225, 232 (1875) (quotation and citation omitted); *see also Kellogg v. Woods*, 720 N.W.2d 845, 853 (Minn. Ct. App. 2006) (explaining that "[t]he appropriate measure for breach-of-contract damages is the amount that will place the nonbreaching party in the same position he would be in had the contract been performed" (citation omitted)). Nevertheless, "it is well established in Minnesota that in the case of a breach of contract the injured party must use reasonable diligence to minimize his damages." *Lanesboro Produce & Hatchery Co. v. Forthun*, 16 N.W.2d 326, 328 (Minn. 1944) (citing *Barron G. Collier, Inc. v. Women's Garment Store, Inc.*, 189 N.W. 403, 404 (Minn. 1922); *Barron G. Collier, Inc. v. Kindy*, 178 N.W. 584, 585 (Minn. 1920); *Wavra v. Karr*, 172 N.W. 118, 120 (Minn. 1919)).

The amounts paid by Scottsdale and the Series A Stockholders are not damages that FMS suffered as a result of Comco's breach. FMS makes much of the term

-11-

"incur," arguing that it merely refers to a liability and not an actual payment. FMS points out that although it did not pay for all of the expenses associated with the Brill–FMS Litigation, it became liable for all of the expenses. As such, FMS seeks damages for all expenses "incurred." This argument, however, ignores the measure of damages resulting from a breach of contract. If Comco had not breached the contract, FMS may be correct that the language of the Management Agreement would entitle it to all reasonable fees, costs, and expenses resulting from the Brill–FMS Litigation. But Comco did breach, and FMS, in accord with its legal duty, mitigated its damages by tendering the defense to Scottsdale and arranging funding with the Series A Stockholders.[5]

FMS attempts to escape this conclusion by arguing that it would not receive a windfall were it to recover the entire $1,133,815.36. According to FMS, the subrogation provision[6] in its insurance policy with Scottsdale demonstrates that FMS has agreed to reimburse Scottsdale. However, FMS has provided no authority suggesting that the general rules on damages are supplanted by the subrogation

---

[5]FMS may have additional damages as a result of tendering its defense to Scottsdale (such as subsequently higher premiums), but it has not sought relief for anything other than the full amount of fees, costs, and expenses resulting from the Brill–FMS Litigation.

[6]FMS's insurance policy with Scottsdale contains the following subrogation provision:

In the event of any payments under this Policy, Insurer shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery against any person or entity. The Insureds shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable Insurer effectively to bring suit or otherwise pursue subrogation in the name of the Insureds, and shall provide all other assistance and cooperation which Insurer may reasonably require.

agreement. After mitigating its damages, FMS paid $87,350 out-of-pocket. Thus FMS's award of $87,350 places it "in the same situation, with respect to damages, as if the contract had been performed." *Paine*, 21 Minn. at 232; *see also Am. Sur. Co. v. State Farm Mut. Auto. Ins. Co.*, 142 N.W.2d 304, 306 (Minn. 1966) (finding that insured "was not damaged by [insurer-]defendant's refusal to defend in violation of its obligations under the policy" because insured's second insurer "was required [to defend] under its own policy"); *Concord Hosp. v. N.H. Med. Malpractice Joint Underwriting Ass'n*, 694 A.2d 996 (N.H. 1997) (refusing to award more than out-of-pocket expenses to a hospital after one of its insurers refused to pay litigation expenses).[7]

FMS also argues that it will not benefit from a windfall because it has orally agreed to reimburse the Series A Stockholders for their contribution to the joint defense fund. FMS overlooks the fact that it cannot recover from Comco what rightfully belongs to the Series A Stockholders. "Because a corporation and its stockholders are separate entities," FMS's ability to successfully sue on behalf of the Series A Stockholders is dubious at best. *See Singer v. Allied Factors, Inc.*, 13 N.W.2d 378, 380 (Minn. 1944) (citations omitted).

The district court correctly limited FMS's recovery from Comco to the $87,350 FMS paid out of pocket.

---

[7]FMS relies on a line of Minnesota cases holding that if an "insured retains some interest in the cause of action, the suit may be brought in his name. If he makes recovery, he has the right to reimburse himself for his loss and expenses and then hold the balance of his recovery in trust for the insurer." *Blair v. Espeland*, 43 N.W.2d 274, 276 (Minn. 1950) (citations omitted); *see also Lines v. Ryan*, 272 N.W.2d 896, 904 (Minn. 1978) (same); *Flor v. Buck*, 248 N.W.2d 743, 744 (Minn. 1933) (same). Those cases involved injured parties that had received judgments. This is a contract case, not a tort case. FMS has not demonstrated that Minnesota would similarly allow double-recoveries for contract disputes.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____